## 77363. BOYD et al. v. ORKIN EXTERMINATING COMPANY, INC.

### (381 SE2d 295)

BANKE, Presiding Judge.

Mr. and Mrs. Boyd brought this action on their own behalves and as next friends of their five minor children to recover actual and punitive damages for personal injuries and property loss allegedly caused by Orkin Exterminating Company's negligent misapplication of insecticide in their home. The trial court concluded that the claims asserted by Mr. and Mrs. Boyd on their own behalves were time barred and consequently entered summary judgment against them. With respect to the children's claims, partial summary judgment was granted to Orkin to the extent that damages were sought for the "increased risk of cancer" to which they had been allegedly exposed by virtue of the alleged misapplication of the chemicals, and the case proceeded to trial on their remaining personal injury claims. However, at the close of the evidence the trial court directed a verdict in favor of Orkin with respect to the claim for punitive damages, and later, when the jury was unable to reach a verdict, it also directed a verdict in Orkin's favor on the issue of its liability for actual damages. This appeal followed.

The gravamen of the complaint was that in 1977 and 1978 Orkin had misapplied the termiticide chlorohepton, consisting of the chemicals chlordane and heptachlor, to the Boyds' home, thereby exposing the family to contact with these toxic chemicals and causing them to suffer neurological injuries. There was evidence that it had been standard industry practice prior to 1975 to spray these chemicals into the crawl space between the subflooring and foundation of a building as a treatment against termites but that the United States Environmental Protection Agency (EPA) had acted that year to prohibit the manufacture of these chemicals for application anywhere except to the subsurface of the ground, based upon a finding that direct exposure to them presented a "serious human cancer risk."

Mr. Boyd testified that within weeks after purchasing the home in 1977, he entered into separate contracts with Orkin for the prevention of subterranean termites, the prevention of wood decay fungus, and routine pest control. He further testified that, soon after signing the contracts, an Orkin representative came to the home, applied "some kind of chemicals" into the holes which he drilled in the foundation, and also sprayed some chemical underneath the wood subflooring of the house. Monthly pest control treatments were commenced at about the same time.

During 1978, Mr. Boyd was advised by Orkin that a second termite treatment would be required, and an Orkin agent subsequently came to the home and conducted the same type of drilling (but not

spraying) procedures as had been conducted during the initial visit. Mr. Boyd stated that during this visit the Orkin representative also sealed the interior vents of the heating system with rags and attached a blower unit to the air ducts.

Throughout 1977 and 1978, Orkin continued to perform the monthly pest control treatments inside the home. Mr. and Mrs. Boyd testified that after each such treatment, a very bad odor would be present in the house and that the odor persisted and worsened with subsequent treatments, even though Orkin switched to different methods of applying the pest control chemical in response to their complaints. There was testimony that the children were complaining of headaches and nausea during this period and that these complaints would increase when the heating system was activated. The Boyds finally asked Orkin to discontinue the monthly pest control treatments, but the odor nevertheless persisted.

In 1982, after reading a newspaper account concerning a similar situation, Mr. Boyd sought assistance from the Georgia Department of Agriculture (GDA), which sent a representative to the home to conduct an inspection. However, this inspection revealed no evidence of a misapplication of termiticide, nor any violation of the Georgia standards pertaining to termite extermination as they had existed in 1977. Later that year, Mr. Boyd again contacted the GDA and was referred to a private chemical consulting firm, which tested air samples from the residence for the presence of chlordane or heptachlor but found no sign of either chemical.

In response to additional complaints by Mr. Boyd, the GDA sent another representative to the home in June of 1985. Air samples taken from the residence at that time tested positive for the chemical chlordane; but because chlordane was still widely available at that time for the control of household pests, and because no heptachlor was found, the GDA concluded that the presence of the chlordane was not necessarily attributable to the Orkin treatments and consequently determined that no regulatory action against Orkin was warranted. However, air and wipe samples which were taken from inside the heating registers later that year tested positive for both chlordane and heptachlor. Also, wood and soil samples taken from the property in June and November of 1986 tested positive for the presence of these chemicals. Concerned over these test results and continuing to experience discomfort from the odor of pesticide in the home, the Boyds ultimately abandoned the residence in 1986.

There was evidence that medical tests conducted on the children in 1986 and 1987 had revealed the presence of significantly elevated levels of heptachlor expoxide, a metabolite of heptachlor in their bloodstreams. Specifically, it was shown that the children's blood contained concentrations of this metabolite ranging from 1.1 to .3 parts

per billion, whereas the population mean value in 1986, as reported by the EPA, was only .042. There was medical opinion testimony that these tests' results demonstrated that the children had "suffered an injury" and would require periodic monitoring over the ensuing years to determine whether they were developing any health problems associated with exposure to toxic pesticides. *Held*:

1. The appellants contend that the trial court erred in granting Orkin's motions for directed verdict. We disagree. Even assuming arguendo that there was sufficient evidence before the jury to support a finding that Orkin had been negligent in its application of pesticides to the Boyds' home, there was no evidence that the appellants had sustained any specific injury as a result of Orkin's conduct. The physicians who had routinely treated the children from 1982 until 1986 characterized their medical histories as unremarkable and described their health as "normal" or "average." The results of organ function tests conducted on the children were all within normal range. Although there was evidence that the children had suffered occasionally over the years from such symptoms as sore throat, runny nose, nausea, and rash, there was no showing that these symptoms, which were also consistent with common viral infections, had been caused by exposure to chlordane or heptachlor.

We reject the appellants' contention that the jury could have assessed damages against Orkin based on expert testimony that the presence of elevated levels of the heptachlor metabolite in the children's blood itself constituted "injury." Absent any indication that the presence of these metabolites had caused or would eventually cause actual disease, pain, or impairment of some kind, this testimony must be considered insufficient to support an award of actual damages in any amount. Inasmuch as punitive damages may not be recovered where there is no entitlement to compensatory damages, *Barnes v. White County Bank*, 170 Ga. App. 681 (318 SE2d 74) (1984), it follows that the trial court did not err in granting the motions for directed verdict.

2. Similarly, the trial court did not err in granting partial summary judgment to Orkin on the issue of the appellants' right to recover for the alleged "increased risk of cancer" to which the children had been exposed as a result of the termite treatments. In those jurisdictions which have allowed recovery for an enhanced future risk of developing a new complication, the claimant has been required to establish to a "reasonable medical certainty" that such consequences will occur. See Annot., Admissibility of Expert Medical Testimony as to Future Consequences of Injury as Affected by Expression in Terms of Probability or Possibility, 75 ALR3d 9 (1977), and cases cited therein. The evidence in the present case falls far short of that standard. The appellants merely produced medical testimony that the

children would require monitoring in the future to determine whether they developed health problems due to their exposure to the chemicals.

3. The trial court did not err in ruling on motion for summary judgment that the damage claims asserted by Mr. and Mrs. Boyd were barred by the applicable statutes of limitation.

OCGA § 9-3-33 specifies that a personal injury claim must be brought within two years after the accrual of a right of action, while actions for damage to realty and personal property are governed by the four-year limitation period set forth in OCGA §§ 9-3-30 and 9-3-31, respectively. The complaint, filed in 1985, alleged that Orkin had misapplied termiticide in the Boyd home in 1977 and 1978. Mr. and Mrs. Boyd contend, however, that the alleged tort was continuing and that, under the "discovery rule" set forth in *King v. Seitzingers, Inc.*, 160 Ga. App. 318, 320 (287 SE2d 252) (1981), their "cause of action did not accrue and the statute of limitation did not run against [them] until [they] knew or through the exercise of reasonable diligence should have discovered not only the nature of [their] injury but also the causal connection between the injury and the alleged negligent conduct of appellee." See also *Everhart v. Rich's, Inc.*, 229 Ga. 798 (2) (194 SE2d 425) (1972).

The "discovery rule" is no longer applicable to causes of action for property damage but is now confined " 'to cases of bodily injury which develop only over an extended period of time' [Cit.]" *Corp. of Mercer Univ. v. Nat. Gypsum Co.*, 258 Ga. 365, 366 (368 SE2d 732) (1988). Thus, the trial court was correct in ruling that any claim for property damage was barred because it had not been brought within four years following Orkin's final termite treatment, which was performed in 1978.

While the personal injury claims asserted by Mr. and Mrs. Boyd were subject to the "discovery rule," we conclude that these claims were barred as a result of the couple's failure to exercise reasonable diligence in pursuing them. The Boyds alleged in their complaint that "shortly after" Orkin treated their home for termites in 1977 and 1978, they "began to suffer acute neurological symptoms" and that they ultimately asked Orkin to cease applying the pesticides in 1978. Mr. Boyd further expressed his dissatisfaction to Orkin by letter in 1978, stating that members of his family were becoming ill as a result of the pest control treatments. It is thus evident that by 1978 the Boyds believed they were suffering adverse physical reactions as a result of the Orkin treatments. However, it was not until the winter of 1981-1982 that Mr. Boyd undertook to investigate the situation further by seeking assistance from the GDA and EPA. Accordingly, the trial court was authorized to conclude that Mr. and Mrs. Boyd's personal injury claims were also barred.

*Judgment affirmed. Birdsong and Beasley, JJ., concur.*

DECIDED MARCH 6, 1989 —
REHEARING DENIED MARCH 27, 1989 —

*Mayer, Nations & Perkerson, Randolph A. Mayer, William W. Calhoun*, for appellants.

*Decker & Hallman, Richard P. Decker, Jay Barber*, for appellee.