Neal PARKER; Wilbert Carlton; Stephen King; Ray Burns; Deborah Watkins; Leonard Ponder; Barbara King; and Patricia Burns, individually and on behalf of all others similarly situated, Plaintiffs,

v.

BRUSH WELLMAN, INC.; Schmiede Machine & Tool Corporation; Thyssenkrupp Materials NA, Inc. d/b/a Copper & Brass Sales, Inc.; Axsys Technologies, Inc.; Alcoa, Inc.; McCann Aerospace Machining Corporation; Cobb Tool, Inc.; and Lockheed Martin Corporation, Defendants.

No. CIV.A.1:04 C V 0606.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 29, 2005.

William Grady Hasty, Jr., Hasty Pope & Ball, Canton, GA, Robert E. Shields, Doffermyre Shields Canfield Knowles & Devine, Atlanta, GA, James Hugh Webb, Jr., Webb Lindsey & Wade, Peachtree City, GA, for Plaintiffs.

J. Kevin Buster, Richard Anthony Schneider, Carmen R. Toledo, Barry Go-

heen, King & Spalding, James Royce Johnson, Robin A. Schmahl, Corliss Lawson, David G. Greene, Jeffrey Scott Bazinet, Paul T. Kim, Lord Bissell & Brook, Edward McDowell Newsom, Alycen A. Moss, Smith Moore, Henry Lane Young, II, M. Elizabeth O'Neill, Hawkins & Parnell, Leeann Jones, Melissa F. Davis, Powell Goldstein Frazer & Murphy, Stephen Edmund O'Day, Andrew McFee Thompson, Smith Gambrell & Russell, Jennifer Grandoff Cooper, Jessica A. Ryan, Gambrell & Stolz, Sewell K. Loggins, Anne M. Landrum, Mozley Finlayson & Loggins, Atlanta, GA, Jeffrey D. Ubersax, PHV, Jones Day, Cleveland, OH, A. Scott Ross, PHV, Philip D. Irwin, PHV, Neal & Harwell, Nashville, TN, Garth W. Aubert, PHV, Mendes & Mount, Los Angeles, CA, for Defendants.

## ORDER

STORY, District Judge.

This case comes before the Court on Defendant Alcoa, Inc.'s Motion to Dismiss for Failure to State a Claim, or in the Alternative, Motion for a More Definite Statement [5]; Defendant Lockheed Martin Corporation's Motion to Dismiss or, in the Alternative, for a More Definite Statement [8]; Defendant Lockheed Martin Corporation's Motion for Judgment on the Pleadings as to Plaintiff's Medical Monitoring, Strict Liability (Ultrahazardous Activity), Increased Risk and Fear Claims [17]; Defendant Alcoa Inc.'s Motion for Judgment on the Pleadings as to Plaintiffs' Claims for Medical Monitoring, Strict Liability (Ultra–Hazardous Activity), and Increased Risk and Fear [18]; Defendant Brush Wellman Inc.'s Motion for Judgment on the Pleadings Based on Plaintiffs'

Lack of Any Cognizable Injury [22]; Defendant Axsys Technologies Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction [28], Motion of Defendant McCann Aerospace Machining Corporation to Dismiss Plaintiffs' Complaint/Motion for More Definite Statement, or in the Alternative, Motion for Judgment on the Pleadings [31]; Schmiede Corporation's Motion to Dismiss or, in the Alternative, for a More Definite Statement [57]; and Defendants' Unopposed Motion for Leave to Exceed Page Limits in their Joint Reply Brief [87].

As a preliminary matter, Defendants' Unopposed Motion for Leave to Exceed Page Limits in their Joint Reply Brief [87] is **GRANTED** *nunc pro tunc*. After reviewing the record and the parties' briefs, the Court addresses the remaining motions before it through the following Order.

### Background

Plaintiffs, certain current and former employees of Defendant Lockheed Martin Corporation ("Lockheed"),[1] as well as select members of those persons' families, initiated this putative class action in the Superior Court of Fulton County, Georgia in late January 2004. Two months later, Lockheed removed the case to federal court pursuant to 28 U.S.C. § 1442(a)(1).

In their Complaint, Plaintiffs allege, generally, that Defendants are all involved in some capacity in the manufacture and/or use of products containing beryllium. (Compl. ¶¶ 15–16.) Plaintiffs assert that they were exposed to a respirable form of the substance, either by virtue of their work at the Lockheed facility in Marietta, Georgia, or through the work of family

---

1. Lockheed is a leading designer and producer of advanced military aircraft.

members at that location who carried beryllium residue home on their skin, clothes, and belongings. (*Id.* ¶ 17.)

According to Plaintiffs, beryllium is a toxic substance, exposure to which can result in adverse effects ranging "from sub-clinical, cellular, and sub-cellular damage, to acute and chronic lung disease, dermatologic disease and cancer." (Compl.¶ 19.) Plaintiffs go on to claim that Defendants either knew or should have known that beryllium had the propensity to cause such injuries, and that their activities at Lockheed's Marietta facility would result in the Plaintiffs' exposure to harmful quantities of the substance. (*Id.* ¶¶ 17–18.) Further, Plaintiffs allege:

> As a foreseeable, direct and proximate result of their exposure to the hazardous substance beryllium, Plaintiffs and other Lockheed workers and their families already have suffered and will suffer in the future personal injuries in the form of sub-clinical, cellular, and sub-cellular damages and some have suffered from acute and chronic lung disease, dermatologic disease, and chronic beryllium disease.

(*Id.* ¶ 22.) Moreover, they assert that all such persons "have been placed at substantially increased risk of catastrophic latent disease, such as chronic beryllium disease and cancer" and "have suffered and will suffer in the future from fear, anxiety, and emotional upset as a result of their personal injuries and because they have been placed at substantially increased risk of catastrophic chronic disease." (*Id.* ¶¶ 23–24.)

Relying on the foregoing allegations, Plaintiffs assert claims for the establishment of a medical monitoring fund, as well as for strict liability in tort, negligence, strict liability for abnormally dangerous and ultra-hazardous activities, fraudulent concealment and civil conspiracy, as well as for punitive damages and attorneys' fees.

### Discussion

Despite the considerable number of motions currently before the Court, the issues ripe for its consideration are actually quite limited. First, the Court must determine whether Plaintiffs' Complaint is so vague and ambiguous as to require a more definite statement. Second, it must evaluate the viability of certain aspects of Plaintiffs' claims, including whether the harmful effects enumerated in Plaintiffs' Complaint constitute cognizable "injuries" under Georgia law, and whether Plaintiffs' claims for medical monitoring and strict liability with respect to alleged ultra-hazardous activities state grounds for relief. Finally, the Court must evaluate whether Defendant Axsys Technologies Inc. ("Axsys") is entitled to be dismissed from this lawsuit for lack of personal jurisdiction. The Court considers each of these issues below.

### I. Motions for More Definite Statement

Defendants Alcoa, Inc. ("Alcoa"), Lockheed Martin Corporation, McCann Aerospace Machining Corporation ("McCann"), and Schmiede Corporation ("Schmiede") each request that the Court either dismiss them from this action or, alternatively, compel a more definite statement from Plaintiffs due to the imprecise nature of Plaintiffs' pleading. Guided by the principle that Rule 12(b)(6) dismissal is disfavored, and that it should be granted only in circumstances where it "appears beyond a doubt that the plaintiff can prove no set of facts" that would entitle him to relief,

the Court declines to dismiss these Defendants from this lawsuit on grounds of indefinite pleading. *See Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).[2] The question, then, is whether Defendants' are entitled to a more definite statement under Rule 12(e).

■ Pursuant to Federal Rule of Civil Procedure 12(e), a party may move for a more definite statement "[i]f a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading ...." Fed.R.Civ.P. 12(e). While the requirements of pleading under the Federal Rules are "liberal," and a litigant need not "allege a 'specific fact' to cover every element or allege 'with precision' each element of a claim[,]" *see Roe v. Aware Woman Ctr. for Choice, Inc.,* 253 F.3d 678, 683 (11th Cir.2001), a pleader must at least provide his opponent with "fair notice of what [his] claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. 99, 2 L.Ed.2d 80. Stated differently, a plaintiff should include in his pleading some brief factual description of the circumstances surrounding the acts or omissions upon which he bases his claim for relief. *See Williams v. Lear Operations Corp.,* 73 F.Supp.2d 1377, 1381 (N.D.Ga.1999) (holding that plaintiff's failure to provide any factual description of "when, where or how" she suffered unlawful treatment rendered her pleading inadequate even under liberal notice pleading standards). In multiparty litigation, moreover, the Federal Rules do not permit a party to aggregate allegations against several defendants in a single, unspecific statement, but instead require the pleader to identify (albeit generally) the conduct of *each* defendant giving rise to his claims. *See Veltmann v. Walpole Pharmacy, Inc.,* 928 F.Supp. 1161, 1164 (M.D.Fla.1996).

■ In the instant case, Defendants bemoan several areas of imprecision in Plaintiffs' pleading. While many of Defendants' complaints appear to misapprehend the level of detail necessitated by the Federal Rules, the Court finds at least some of the omissions in Plaintiffs' pleading leave Defendants without "fair notice" of the claims being asserted against them.

First, the Court finds that the Complaint does not give each Defendant "fair notice" of the role *it* or *its* product is alleged to have played in causing Plaintiffs' injuries. Plaintiffs state broadly that Defendants were "manufacturers," "fabricators," "distributors," "seller[s]," "machiners," or "users" of beryllium-containing products sold to and used at the Lockheed Marietta facility. (Compl.¶¶ 15–16.) Moreover, they claim to have been exposed to respirable beryllium dust "as a ... result of the sale and use of beryllium-con-

**2.** Alcoa replied separately in support of its motion to dismiss, in which it had argued that Plaintiffs' failure to allege that any of its products caused Plaintiffs' exposure to beryllium warranted dismissal. In that reply, Alcoa emphasizes that Plaintiffs' response brief identified Alcoa merely as a supplier of *aluminum* to Brush Wellman, Inc. ("Brush Wellman"), who in turn used that aluminum to create a beryllium-aluminum composite, AlBeMet, that was in turn allegedly used at Lockheed's Marietta facility. The Court is inclined to agree with Alcoa that, if Plaintiffs' amended pleading does no more than reiterate such allegations, Alcoa would be entitled to be dismissed from this action. Nevertheless, as Alcoa acknowledges in its papers, the focus of the Rule 12(b)(6) dismissal inquiry is on the *pleadings,* not the parties' briefs, and the Court will permit Plaintiffs to amend their Complaint to state a claim against them rather than dismissing the company based on assumptions stemming from language in a response brief.

taining products by the Defendants at the Lockheed Marietta facility." (Compl.¶ 21.) Beyond these general averments, however, there are no factual allegations regarding whether Plaintiffs were exposed to *each* individual Defendant's beryllium-containing products, nor are there any allegations regarding the approximate times (*i.e.*, approximate date ranges) of alleged beryllium exposure. In the absence of such critical allegations, Defendants are left without "fair notice" of the factual basis underlying the claims that they must now attempt to defend. *Cf. Roe*, 253 F.3d at 683 ("it is . . . necessary that a complaint 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory' ") (*quoting In re Plywood Antitrust Litig.*, 655 F.2d 627, 641 (5th Cir. Unit A Sept.8, 1981)); *Lee v. Celotex Corp.*, 764 F.2d 1489, 1491 (11th Cir.1985) (in toxic-exposure case, plaintiff must show that he or she was directly exposed to a particular defendant's product); *Lowie v. Raymark Indus.*, 676 F.Supp. 1214, 1216 (S.D.Ga.1987) (under Georgia law, as interpreted by Eleventh Circuit, plaintiff in toxic-exposure case "must show contact with specific products at ascertained times").

Second, the Complaint fails to segregate the Plaintiffs who are alleged to have endured only subclinical, cellular, and subcellular effects as a consequence of their beryllium exposure from those who have instead endured manifest physiological injury. As the Court concludes *infra*, the former effects do not constitute actionable "injuries" under applicable tort doctrine, and consequently, those Plaintiffs who rely on such effects to plead their case have failed to state a claim upon which relief may be granted. In order to perfect the record, Plaintiffs should amend their pleading to identify those persons who have suffered only such effects. Following such amendment, the Court will enter an Order dismissing the claims asserted by those persons.

In sum, Defendants Rule 12(e) motions are **GRANTED in part and DENIED in part.** Plaintiffs are **ORDERED**, within twenty (20) days from the date appearing on this Order, to amend their pleading: (1) to include factual allegations respecting whether Plaintiffs were exposed to each individual Defendant's beryllium-containing products; (2) to include approximate date ranges of the alleged exposure; and (3) to segregate out those Plaintiffs who have endured only subclinical, cellular, and subcellular effects from those who have sustained actionable tort injuries. The motions are denied in all other respects.

## II. Legal Viability of Plaintiffs' Claims

Defendants Lockheed, Alcoa, Brush Wellman, McCann, and Schmiede likewise challenge the viability of several aspects of Plaintiffs' claims. Specifically, they challenge whether the "harms" cited in Plaintiffs' Complaint constitute cognizable tort injuries under Georgia law, and argue that Plaintiffs' claims for medical monitoring and strict liability (ultra-hazardous activities) fail to state grounds for relief.

These issues come before the Court on Rule 12 motions to dismiss and motions for judgment on the pleadings. Consequently, the Court accepts as true the allegations set forth in the Complaint, and construes them in the light most favorable to the non-movants. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Conner v. Tate*, 130 F.Supp.2d 1370, 1373 (N.D.Ga.2001). The motions may be granted, moreover, only if "it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99. Nevertheless, when, under applicable law, the Court concludes that a particular claim is not viable, it "must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

## A. Cognizable Injuries

### 1. *Subclinical Effects*

■ An overarching issue in this litigation is whether Plaintiffs who have endured only "sub-clinical, cellular, and subcellular damage"[3] from alleged beryllium exposure may rely on such effects as a physical "injury" sustaining tort recovery. *Cf. Pickren v. Pickren*, 265 Ga.App. 195, 593 S.E.2d 387, 388 (2004) (to recover in tort, party must have suffered injury to either person or property). By definition, "subclinical" refers to a condition that is "[n]ot manifesting characteristic clinical symptoms." American Heritage College Dictionary 1350 (3d ed.2000); *see also* Merriam–Webster Medical Dictionary (2002) (defining subclinical as "not detectable or producing effects that are not detectable by the usual clinical tests"). Defendants argue, and this Court agrees, that such a "subclinical" condition, lacking in any contemporaneous physiological manifestations, is not a cognizable "injury" under applicable tort law.

Plaintiffs expressly predicated their claims in this action on the laws of the State of Georgia, and Defendants have acknowledged the application of those laws to the claims presented in this case. Consequently, this Court will evaluate the viability of Plaintiffs' claims under Georgia law.

According to the Eleventh Circuit, the district court's task when it encounters a legal question governed by state law is to attempt to discern what the highest state court would do if faced with an identical question. *See Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1080 (11th Cir.2004); *KMS Rest. Corp. v. Wendy's Int'l Inc.*, 361 F.3d 1321, 1325 (11th Cir.2004). When the state supreme court has not specifically addressed an issue, however, the court is bound to apply the precedents of the state's intermediate appellate courts absent "some really persuasive indication" that the state supreme court would decide the issue differently. *KMS Rest. Corp.*, 361 F.3d at 1325; *see also Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.*, 136 F.Supp.2d 1340, 1347 (N.D.Ga.2001) (same).

In Georgia, the question of whether asymptomatic conditions or subclinical effects constitute cognizable injuries has not frequently made it before courts of appellate jurisdiction. There is, however, one published opinion of the Georgia Court of Appeals in which the issue was addressed, and the question answered in the negative. *See Boyd v. Orkin Exterminating Co., Inc.*, 191 Ga.App. 38, 381 S.E.2d 295, 297–98 (1989), *overruled on unrelated grounds, Hanna v. McWilliams*, 213 Ga.App. 648, 446 S.E.2d 741 (1994).

---

**3.** Herein, for ease of reference, the Court refers to "sub-clinical, cellular, and subcellular damage" as "subclinical" effects. Although the Court appreciates that differences exist between effects that are "cellular," "subcellu-lar," and "subclinical" in nature, it has found no case in which one was recognized as an injury and the other(s) not, and discerns no basis for treating the effects differently for purposes of the current analysis.

In *Boyd*, homeowners sued a pest control company alleging that it negligently misapplied insecticide inside their residence, resulting in the exposure of themselves and their children to harmful levels of toxic substances. 381 S.E.2d at 296. Indeed, the evidence at trial demonstrated the presence of toxin metabolites in the children's blood at concentrations up to twenty-six times higher than that typically found in the population. *Id.* at 297. A medical expert opined that the test results "demonstrated that the children had 'suffered an injury' and would require periodic monitoring over the ensuing years to determine whether they were developing any health problems associated with exposure to toxic pesticides." *Id.* Notwithstanding this testimony, the trial court granted the defendant directed verdict, stating that the presence of such metabolites in the children's bloodstream did not constitute a cognizable "injury" under Georgia law. *Id.* at 298. The Court of Appeals affirmed, and in doing so, expressly rejected the "contention that the jury could have assessed damages ... based on expert testimony that the presence of elevated levels of the [toxin] metabolite in the children's blood itself constituted 'injury.'" *Id.*[4]

Given the *Boyd* court's apparent rejection of subclinical effects as actionable "injuries," and considering the lack of any Georgia Supreme Court authority suggesting the law in the State to be otherwise, *Boyd* appears to preclude Plaintiffs' reliance on subclinical effects as a cognizable "injury" in this case. *See Chepstow*, 381 F.3d at 1080 (absent state supreme court authority appearing to suggest a contrary result, federal court is bound to apply holding of state intermediate appellate court on issues of state law).[5] However, even absent the *Boyd* decision, this Court

4. The Court of Appeals somewhat clouded the contours of its holding by stating that plaintiffs could not recover "[a]bsent any indication that the presence of these metabolites had caused or *would eventually cause* actual disease, pain, or impairment of some kind[.]" 381 S.E.2d at 298 (emphasis supplied). Read out of context, the italicized language could be understood as an indication that, had plaintiffs come forward with evidence that the presence of toxin metabolites increased the risk of disease to their children, such presence might have sufficed as an actionable "injury."

The next enumerated paragraph of the opinion, however, forecloses such a reading. There, the Court of Appeals expressly rejected the plaintiffs' argument that the lower court had erred by granting partial summary judgment to the defendant on plaintiffs' claims of "increased risk," *notwithstanding testimony* that the presence of the toxins would result in the elevation of the children's susceptibility to developing cancer. *Id.* at 298. It stated that even in those jurisdictions recognizing a claim for increased risk (a group of jurisdictions into which it did not purport to place Georgia), the claimant must establish to a "reasonable medical certainty" that the adverse consequences would occur. *Id.*

A fair reading of the opinion, then, illustrates the italicized language did not "open the door," so to speak, to tort claims predicated on subclinical effects in circumstances where those effects would tend to increase the risk of manifest impairment to the affected party. The Court of Appeals did not even so much as imply that its analysis (and rejection) of plaintiffs' "increased risk" arguments would have had any bearing on its previous conclusion that subclinical effects did not constitute cognizable "injuries" as a matter of law.

5. Plaintiffs in their papers emphasize that Georgia requires only a "slight" injury to sustain tort recovery, and cite *Chambley v. Apple Restaurants, Inc.*, 233 Ga.App. 498, 504 S.E.2d 551 (1998), as supporting the view that they have endured a cognizable injury in this case. In *Chambley*, the Georgia Court of Appeals held that the plaintiff had suffered an "injury" sufficient to recover for emotional distress as a result of her eating a salad in which she discovered an unwrapped condom. After eating a portion of the salad, she began

would be strongly disinclined, under the guise of applying Georgia law, to extend the parameters of state tort liability to include "injuries" of a purely subclinical nature.

■ The issue of whether the presence of subclinical effects constitute a cognizable injury is not one on which the law, from a national perspective, is well-settled. *Compare Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3rd Cir.1985) (holding "that subclinical injury resulting from exposure to [toxins] is insufficient to constitute the actual loss or damage to plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law"); *Laswell v. Brown*, 683 F.2d 261, 269 (8th Cir.1982) (rejecting, under Federal Tort Claims Act, "expos[ure] to an unusually high risk of disease in genetically passed cellular damage" as cognizable injury); *with, Werlein v. United States*, 746 F.Supp. 887, 901 (D.Minn.1990), *vacated in part* 793 F.Supp. 898 (1992) (holding that question of fact existed as to whether "chromosomal breakage[ ] and damage to the cardiovascular and immunal systems" caused by exposure to contaminated air and drinking water constituted injury); *Barth v. Firestone Tire & Rubber Co.*, 661 F.Supp. 193, 196 (N.D.Cal.1987) (holding that plaintiff's allegations of injury to his immune system and increased risk of cancer satisfied burden to allege injury, notwithstanding plaintiff's failure to "allege any symptom of injury which can be clinically diagnosed at th[e] time").[6] As the foregoing discussion makes clear, moreover, this Court has been unable to locate any Georgia authority that would appear to suggest that such effects amount to a cognizable tort "injury." A decision by this Court permitting Plaintiffs to proceed on such a theory would therefore be taking Georgia law in a new and controversial direction that neither that State's legislature nor judiciary has indicated is appropriate. Such is not the proper function of a federal court. *See*

suffering from gastric distress and psychological problems.

While *Chambley* does indeed appear to illustrate the flexibility of the "impact" element of Georgia's "impact rule" (a rule establishing a precondition to a plaintiff's recovery for negligently inflicted emotional distress), the Court does not read the case as helping to advance Plaintiffs' position here. First, *Chambley* addressed a situation in which the plaintiff *did* manifest physiological symptoms in connection with the defendant's alleged tortious act, and the Court of Appeals was not called upon to determine whether "subclinical" effects were alone sufficient to sustain recovery in tort. Second, the Court of Appeals in *Chambley* based its holding in large part on the implications of policies underlying the Georgia Food Act to the case before it, *i.e.*, the need to protect Georgians from the ingestion of adulterated food, and the impact of its holding on Georgia tort doctrine must accordingly be evaluated in light of the unique context in which the case arose. *See Chambley*, 504 S.E.2d at 553 ("To encourage restaurants to avoid their statutory duty to consumers by serving adulterated food in blatant violation of the Georgia Food Act, then allowing restaurants to escape liability because the consumer's physical reaction appears to have been psychological in origin simply cannot be the law.").

6. At one point in their papers, Plaintiffs suggest that the question of whether particular subcellular or subclinical effects amount to "injury" should be left for resolution by the finder of fact. Although such an approach has some facial appeal, this Court believes that the fundamental, threshold question of whether non-manifesting physical conditions constitute actionable "injury" as a matter of tort doctrine is more accurately seen as one of law. Allowing fact-finders to impose liability in some "subclinical" cases but not others would invite needless inconsistency into the tort system, and would likely produce arbitrary and irreconcilable results between cases.

*Cargill, Inc. v. Offshore Logistics, Inc.*, 615 F.2d 212, 215 (5th Cir.1980) (it is up to state high court, and not federal court, to change state law); [7] *see also City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3rd Cir.2002) ("it is not the role of a federal court to expand state law in ways not foreshadowed by state precedent").[8]

Insofar as Defendants move to dismiss Plaintiffs' claims relying on injuries that are "sub-clinical, cellular, or sub-cellular" in nature, their motions are **GRANTED**. Plaintiffs are directed, in conformity with the Court's ruling above, to amend their pleading to segregate out those Plaintiffs who have endured only subclinical, cellular, and subcellular effects from those who have sustained actionable tort injuries. Following such amendment, the Court will enter an Order dismissing the claims asserted by the former subset of claimants.

### 2. *Increased Risk, Emotional Distress*

■ In their Complaint, Plaintiffs also assert that they "have been placed at substantially increased risk of catastrophic latent disease, such as chronic beryllium disease and cancer" and "have suffered and will suffer in the future from fear, anxiety, and emotional upset as a result of their personal injuries and because they have been placed at substantially increased risk of catastrophic chronic disease." (*Id.*

¶¶ 23–24.) These alleged consequences of beryllium exposure are incorporated in most of Plaintiffs' claims as injuries for which they are entitled to recover in tort. Defendants, however, argue that neither set of effects constitute cognizable harms under Georgia law. This Court, with respect to those Plaintiffs who have suffered only subclinical effects (as opposed to manifest physiological symptoms), agrees.

As an initial matter, the Court observes that no Georgia court has adopted a theory of liability premised on the mere "increased risk" of suffering from a future disease or injury. *Cf. Boyd*, 381 S.E.2d at 298 (appearing to reject "increased risk" theory as grounds for recovery); O.C.G.A. § 51–12–8 ("If the damage incurred by the plaintiff is only the imaginary or possible result of a tortious act or if other and contingent circumstances preponderate in causing the injury, such damage is too remote to be the basis of recovery against the wrongdoer."). Indeed, Plaintiffs in their responsive papers appear to concede that a cause of action for increased risk is not independently viable, but rather, suggest that their allegations of increased risk only serve to bolster their entitlement to recover damages related to emotional distress.

The question becomes, then, whether Plaintiffs have pled facts that would entitle them to recover for emotional distress as a

7. The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981).

8. Indeed, the Georgia courts themselves have seemed singularly reluctant to effect such sizable shifts in Georgia law through judicial decision, instead preferring to leave such issues for the legislature's consideration. *See,* *e.g., Carter v. Glenn*, 243 Ga.App. 544, 533 S.E.2d 109, 115 (2000) (fundamental alteration in Georgia law was for legislature to effect, not the courts); *Evans v. Bibb Co.*, 178 Ga.App. 139, 342 S.E.2d 484, 486 (1986) ("These inadequacies in our existing law, however, if they be such, cannot be supplied by the courts, and may only be corrected by the General Assembly.") (*quoting Davis v. Atlanta Gas Light Co.*, 82 Ga.App. 460, 61 S.E.2d 510 (1950)).

result of their beryllium exposure. As it relates to those plaintiffs who have not yet endured manifest physiological injury, a careful review of Georgia law reveals that they have not.

■ In order to recover damages for negligently inflicted emotional distress under Georgia's "impact rule," a plaintiff must plead and prove (i) a physical impact to his person, (ii) that the impact caused "physical injury," and (iii) that such injury is the cause of the claimed emotional distress. *Lee v. State Farm Mut. Ins. Co.*, 272 Ga. 583, 533 S.E.2d 82, 85 (2000). As discussed above, however, this Court does not perceive the presence of subclinical effects as a cognizable "injury" under Georgia law. Thus, Plaintiffs who are alleged to have endured only such effects fail to cross the threshold hurdle the Georgia courts have erected for recovery for negligently inflicted emotional distress.

Plaintiffs, while not seriously challenging these persons' failure to literally satisfy the requirements of Georgia's "impact rule," urge that two lines of cases reveal alternate or relaxed showings a plaintiff can make to sustain recovery for negligent infliction of emotional distress. After carefully considering the cited authorities, however, the Court does not believe either line of precedent advances Plaintiffs' position here.

The first set of cases cited by Plaintiffs includes *Lee v. State Farm Mutual Insurance Company*, 272 Ga. 583, 533 S.E.2d 82 (2000), and *Chambley v. Apple Restaurants, Inc.*, 233 Ga.App. 498, 504 S.E.2d 551 (Ga.Ct.App.1998). In *Lee*, the Georgia Supreme Court found "an appropriate and compelling situation" to depart from the traditional impact rule in a case involving a mother's claim for emotional distress aris-

ing out of witnessing the death of her daughter in a car accident in which both mother and daughter were involved. *See* 533 S.E.2d at 86–87. In *Chambley*, as discussed *supra*, the Georgia Court of Appeals permitted a woman to recover for emotional injuries she suffered in connection with her ingesting a salad in which she later discovered an unwrapped condom.

The Court acknowledges that both *Lee* and *Chambley* illustrate the Georgia courts' openness to engage in limited departures and/or flexible applications of the "impact rule" in especially compelling cases. Neither case, however, purported to abandon the impact rule's mandates altogether; indeed, a thorough reading of *Lee* underscores the Georgia Supreme Court's strong inclination to retain the impact rule as a "bright line" test for recovery of negligently inflicted emotional distress damages. *Lee*, 533 S.E.2d at 86. Moreover, both *Lee* and *Chambley* presented circumstances in which the plaintiffs exhibited some manifestations of physiological injury (albeit ones whose relationship to the relevant "impact" were somewhat attenuated). Consequently, the courts' allowance of narrow departures from the strictest application of the impact rule did not implicate the concerns of speculative claims and "floods" of litigation that the rule was crafted to avoid. *See Lee*, 533 S.E.2d at 86 (discussing policies underlying impact rule).

In sharp contrast, opening the door to emotional distress claims in connection with a person's actual or potential exposure to dynamic toxins (which could just as easily include automobile exhaust, cigarette smoke, pesticides, or contaminants found in drinking water as beryllium dust) would effectively erase the "bright" line

the Georgia judiciary has drawn to act as an indelible barrier to a significant increase in the number of such claims. It is difficult to imagine *any* Georgia resident who would not be able to bring a suit for emotional distress if such a *de minimis* threshold were adopted in place of the "impact rule." For that reason, the Court does not read either *Lee* or *Chambley* as providing a basis for recognizing the claims Plaintiffs attempt to advance here.

The second line of authorities cited by Plaintiffs involve claimants who developed a fear of contracting Human Immunodeficiency Virus (HIV) after coming into contact with an agent or substance that could conceivably transmit the disease. *See, e.g., Johnson v. Am. Nat'l Red Cross*, 276 Ga. 270, 578 S.E.2d 106, 110 (2003) (affirming grant of summary judgment to blood bank on negligent infliction of emotional distress claim); *Russaw v. Martin*, 221 Ga.App. 683, 472 S.E.2d 508, 512 (1996) (affirming grant of summary judgment to hospital and nurse on negligent infliction of emotional distress claim). Those cases, according to Plaintiffs, establish that a claimant may recover for emotional distress in connection with a fear of contracting a disease if she can demonstrate both a "channel of communication" and "actual exposure" to the disease-causing agent.

The Court recognizes that some language exists in the *Johnson* opinion that could give rise to such an understanding of Georgia law. *Cf. Johnson*, 578 S.E.2d at 110 ("*Russaw* sets forth a requirement of evidence of 'actual exposure' in addition to a 'channel of communication' or order to allow recovery for emotional injuries and mental anguish.") (*citing Russaw*, 472 S.E.2d at 511–12). A closer reading of the cited decisions, however, simply illustrates a *per se* rejection by the Georgia courts of

any tort recovery predicated on fear of contracting HIV in the absence of "actual exposure" to the virus. *See, e.g., Russaw*, 472 S.E.2d at 512 ("To allow recovery for emotional injuries and mental anguish, without any proof whatsoever that [plaintiff] was actually exposed to HIV or hepatitis is per se unreasonable."). The Court has found no Georgia authority relying on this line of precedent actually *permitting* recovery for negligent infliction of emotional distress in any case where exposure to some potentially disease-causing agent is shown.

Further, the Court observes that, in any event, the law surrounding feared HIV exposure has developed into a unique subspecies of emotional distress doctrine-one which may not easily or seamlessly be supplanted into other areas of the tort law. *Cf. generally* Kimberly C. Simmons, Annotation, *Recovery for Emotional Distress Based on Fear of Contracting HIV or AIDS*, 59 A.L.R. 5th 535 (1998). To the contrary, the Court believes that a real and meaningful distinction may be drawn between cases involving exposure to highly contagious viral agents (such as HIV), which are in and of themselves "diseases," from toxins that have only the remote *potential* to result in the development of illness or injury at some point in the future.

In sum, with respect to those Plaintiffs who are alleged to have endured only subclinical effects, the absence of any cognizable injury forecloses any recovery for negligently inflicted emotional distress under Georgia's "impact rule." Insofar as Defendants move to dismiss these "subclinical" Plaintiffs' claims for increased risk and negligent infliction of emotional distress, their motions are **GRANTED**.

### B. Medical Monitoring

■ Defendants likewise move to dismiss Count I of Plaintiffs' Complaint, seek-

ing the establishment of a medical monitoring fund.[9] Plaintiffs argue against this result, pointing out, correctly, that many (if not most) states to have confronted the issue have approved of the creation of such funds when plaintiffs have been exposed to potentially injury-inducing agents, but have not yet manifested any physiological symptoms associated with such exposure.

Plaintiffs' argument, while well-researched and skillfully presented, does not persuade this Court that Count I of the Complaint states a viable claim for relief under Georgia law. While a remedy permitting creation of medical monitoring funds has garnered support in several jurisdictions, no Georgia court has ever indicated an inclination to recognize such a remedy. Moreover, several courts have recently rejected the creation of such funds as an available avenue of relief for persons exposed to hazardous agents who have not yet suffered manifest physiological injury, and the remedy remains a controversial one. *See Trimble v. Asarco, Inc.*, 232 F.3d 946, 963 (8th Cir.2000) (refusing to recognize medical monitoring fund as remedy); *Wood v. Wyeth–Ayerst Labs.*, 82 S.W.3d 849, 856 (Ky.2002) (same); *Hinton v. Monsanto Co.*, 813 So.2d 827, 830–31 (Ala.2001) (same); *Badillo v. Am. Brands, Inc.*, 117 Nev. 34, 16 P.3d 435, 438–39 (2001) (same). Again, it is not the function of a federal court to expand state tort doctrine in novel directions [10] absent clear state authority sug-

gesting the propriety of such an extension. *See Cargill, Inc.*, 615 F.2d at 215 (it is up to state high court, and not federal court, to change state law); *Beretta U.S.A. Corp.*, 277 F.3d at 421 (same); *Paz v. Brush Engineered Materials, Inc.*, 351 F.Supp.2d 580, 586 (S.D.Miss.2005) (in case alleging exposure to beryllium, refusing to recognize medical monitoring fund as available remedy as a matter of Mississippi law absent any Mississippi authority approving of such a remedy); *Jones v. Brush Wellman, Inc.*, Case No. 1:00–CV–0777, 2000 WL 33727733, at *8 (N.D.Ohio 2000) (in case alleging exposure to beryllium, refused to recognize medical monitoring fund as available remedy as a matter of Tennessee law absent any Tennessee authority approving of such a remedy). This Court declines to do so here.

Accordingly, Defendants' motions, to the extent they seek dismissal of Count I of Plaintiffs' Complaint, are **GRANTED**. This Court does not read Georgia law as permitting the establishment of a medical monitoring fund with respect to persons who have not endured a cognizable tort injury. That said, nothing in this opinion should be read as foreclosing Plaintiffs who *have* suffered manifest physiological injury from recovering future medical expenses as an element of their total relief.

### C. Strict Liability (Ultrahazardous Activities)

Defendants additionally move to dismiss Count IV of Plaintiffs' Complaint, in which

---

9. Plaintiffs alternatively suggest in Count I of their Complaint that this Court should permit recovery of medical monitoring costs as "future medical expenses." To the extent the plaintiffs seeking such relief have suffered only "subclinical" effects, such recovery is not available for all the reasons set forth *supra*, Part II.A.

10. Plaintiffs argue that the establishment of medical monitoring funds is not an exceptional remedy, but rather, a natural extension of

traditional tort doctrine. Although the Court recognizes those authorities so stating, *see, e.g., Day v. NLO*, 851 F.Supp. 869, 880 (S.D.Ohio 1994), it tends to agree with those jurisdictions that have instead recognized that providing relief to persons who have suffered no cognizable "harm" is a drastic and fundamental departure from traditional tort doctrine. *See, e.g., Badillo*, 16 P.3d at 438 ("Medical monitoring is a novel, non-traditional tort and remedy.").

Plaintiffs seek to recover on a theory of strict liability in connection with activities of Defendants that Plaintiffs characterize as abnormally dangerous and ultra-hazardous. The asserted grounds for dismissal are twofold. First, Defendants argue that such strict liability in Georgia is limited, as a matter of law, to activities "historically regarded as ultrahazardous"-*i.e.,* blasting and retention and diking of water. Second, they argue that, in any event, the mere manufacture of a dangerous product cannot serve as the basis for such liability, the focus instead being on the whether the *activity* engaged in by the defendant was itself abnormally dangerous. Georgia law as it relates what constitutes an abnormally dangerous activity sufficient to sustain strict liability is not voluminous. As recently explained by the District Court for the Middle District of Georgia,

> Georgia courts have provided little guidance as to what constitutes an abnormally dangerous activity. "[T]he activity of holding highly acidic water in ponds which may pollute streams running through the property of adjoining landowners is not a dangerous activity" as a matter of law. [Cit.] Neither is the " 'piling of dirt on defendant's own property in carrying out a legitimate business activity.' " [Cit.] Blasting "has always been considered, as a matter of law, an abnormally dangerous activity." [Cit.] Thus blasting in Georgia is abnormally dangerous, but holding highly acidic water on one's property might not be. The Court is unable to find any other Georgia law on what constitutes an abnormally dangerous activity.

*Gullock v. Spectrum Scis. and Software, Inc.,* 146 F.Supp.2d 1364, 1374 (M.D.Ga. 2001). This Court has likewise found little guidance under Georgia law to assist it in ruling on Defendants' motions here. Nevertheless, for the reasons that follow, the Court concludes that Defendants are not entitled to prevail on their motions to dismiss at this juncture.

First, while the Georgia courts have deemed certain activities to be abnormally dangerous as a matter of law, and others not, the Court finds nothing in applicable precedent either expressly or implicitly limiting the doctrine of strict liability for abnormally dangerous activities to those activities Defendants contend have "historically" been recognized as such. Indeed, the Georgia Court of Appeals has appeared (in a departure from the prevailing view) to hold that, in many instances, the question of what constitutes an abnormally dangerous activity will be one of fact for the jury to decide. *See Combustion Chems., Inc. v. Spires,* 209 Ga.App. 240, 433 S.E.2d 60, 63 (1993) ("An appropriate charge *to the jury* in this case would simply have instructed the jury that if *they* found defendant conducted an abnormally dangerous activity which proximately caused plaintiffs' injuries, then defendant should be held liable for those injuries.") (emphasis supplied).

■ Second, while Defendants appear to be correct in asserting that the mere manufacture of a dangerous product is not sufficient to impose strict liability, *see, e.g., Akee v. Dow Chem. Co.,* 293 F.Supp.2d 1140, 1144 (D.Haw.2002) ("the fact that a defendant is engaged in the manufacture of an extremely harmful substance or product does not compel the conclusion that the manufacture of that substance or product is itself an ultrahazardous activity"); *Splendorio v. Bilray Demolition Co.,* 682 A.2d 461, 465–66 (R.I.1996) ("Absolute liability attaches only to ultrahazardous or abnormally dangerous *activities* and not to

ultra-hazardous or abnormally dangerous *materials.*") (emphasis in original), that does not answer the question whether the instant claims are subject to Rule 12(b)(6) dismissal. Here, in the current iteration of the Complaint, Defendants are identified as both "manufacturers" *and* "users" of beryllium-containing products (*see* Compl. ¶¶ 15–16), and Plaintiffs claim to have been exposed to respirable beryllium dust "as a . . . result of the sale *and use* of beryllium-containing products by the Defendants at the Lockheed Marietta facility." (Compl. ¶ 21 (emphasis supplied).) This allegation that Defendants *used* beryllium-containing products at the relevant facility takes this controversy outside of the "pure" manufacturing cases cited by Defendants, and puts in issue whether Defendants actually engaged in an *activity* (*i.e.,* use of beryllium) that was itself abnormally dangerous. *Cf. Akee,* 293 F.Supp.2d at 1143 (in dismissing claim against manufacturers under "ultra-hazardous activity" doctrine, emphasized that complaint was "devoid of any '*use* or application' allegations with respect to the Manufacturing Defendants") (emphasis supplied).

Accordingly, insofar as Defendants seek to dismiss Count IV of Plaintiffs' Complaint, their motions are DENIED.

## III. Defendant Axsys Technologies Motion to Dismiss for Lack of Personal Jurisdiction

The final motion pending before the Court is Axsys' Motion to Dismiss for Lack of Personal Jurisdiction [28–1]. The plaintiff bears the burden of establishing personal jurisdiction over a defendant. *Francosteel Corp. v. M/V Charm,* 19 F.3d 624, 626 (11th Cir.1994); *Paul, Hastings, Janofsky, & Walker, LLP v. City of Tulsa,* 245 F.Supp.2d 1248, 1253 (N.D.Ga.2002). For purposes of resolving a motion to dismiss for lack of personal jurisdiction, the court generally construes as true the plaintiff's allegations supporting the existence of jurisdiction. *Morris v. SSE, Inc.,* 843 F.2d 489, 492 (11th Cir.1988). Nevertheless, if the defendant controverts the plaintiff's allegations with evidence, the plaintiff, to survive the motion to dismiss, must produce evidence of his own to make a *prima facie* jurisdictional showing. *Welt Indus., Inc. v. Weingart, Inc.,* 660 F.Supp. 424, 425 (N.D.Ga.1987); *see also Weinstock v. Gannett, Inc.,* Case No. 1:00–CV–2935–ODE, 2001 WL 1147214, at *2 (N.D.Ga. June 20, 2001) (holding likewise).

Here, Plaintiffs have sued Axsys, a Delaware corporation with its principal place of business in Connecticut, as the parent corporation and alleged "successor-in-interest" to Speedring, Inc. ("Speedring"), which is alleged to have sold beryllium containing products to the Lockheed Marietta facility. (Compl.¶ 7.) Plaintiffs do not, however, attempt to argue that Axsys *itself* has had any "contacts" with Georgia sufficient to sustain this Court's exercise of either general or specific jurisdiction over the corporation. (*See* Pls.' Resp. to Axsys Technologies, Inc.'s Mot. to Dismiss for Lack of Personal Jurisdiction [62–1] at 1 ("Personal jurisdiction exists over Axsys . . . because the tortious acts of Speedring caused injury in Georgia.").)

In order to exercise personal jurisdiction over a parent company by virtue of their subsidiary's activities within or affecting the forum state, the parent must have exercised an unusually high degree of control over the subsidiary. *See, e.g., Vogt v. Greenmarine Holding, LLC,* Case No. 1:01–CV–0311–JOF, 2002 WL 534542, at *4–*7 (N.D.Ga. Feb.20, 2002) (citing

cases); *cf. also Consol. Dev. Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1293 (11th Cir. 2000) (in context of Fed.R.Civ.P. 4(k)(2), held that so long as subsidiary has·maintained "some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary") (*quoting Portera v. Winn Dixie of Montgomery, Inc.,* 996 F.Supp. 1418, 1423 (M.D.Ala.1998)); *Coca–Cola Co. v. Procter & Gamble Co.,* 595 F.Supp. 304, 308 (N.D.Ga.1983) (court may exercise jurisdiction over parent based on actions of subsidiary "if the parent's control over the subsidiaries' [sic] activities is so complete that the subsidiary is, in fact, merely a division or department of the parent"); *Cobb County v. Jones Group P.L.C.,* 218 Ga.App. 149, 460 S.E.2d 516, 520–21 (1995) (holding likewise, and finding that parent's control over subsidiary was insufficient to exercise jurisdiction over it based upon acts of its subsidiary). Here, Axsys has submitted sworn testimony that it has not exercised such control over Speedring, that Speedring has continued to operate as a going concern following Axsys' 1996 acquisition of its parent company, and that the corporations maintain separate offices and identities. Plaintiffs have failed to counter such testimony with any evidence, and have instead offered only unauthenticated documents showing that Speedring accepted beryllium-containing products on behalf of Lockheed from Brush Wellman *prior* to Axsys' acquisition of Speedring's parent corporation in 1996. Such "evidence" is plainly insufficient to carry Plaintiffs' burden of making a *prima facie*

showing of jurisdiction over Axsys under the foregoing authorities.

Plaintiffs, appearing to acknowledge the insufficiency of their present showing, nevertheless request that they be permitted jurisdictional discovery prior to this Court's resolution of Axsys' motion to dismiss.[11] Given the total dearth of evidence supporting a conflation of Axsys and Speedring's corporate identifies in a manner sufficient to attribute the latter's jurisdictional contacts to the former, however, the Court is not inclined to grant Plaintiffs leave to conduct a "fishing expedition" in hopes that discovery will sustain the exercise of personal jurisdiction over Axsys. *See Posner,* 178 F.3d at 1214 n.7 (affirming dismissal of case based on lack of personal jurisdiction prior to allowance of jurisdictional discovery); *Vogt,* 2002 WL 534542, at *7 (denying jurisdictional discovery under similar circumstances); *Milligan Elec. Co. v. Hudson Const. Co.,* 886 F.Supp. 845, 850 (N.D.Fla.1995) (same).

Accordingly, Axsys' Motion to Dismiss for Lack of Personal Jurisdiction [28–1] is **GRANTED**. Plaintiffs' claims against Axsys are **DISMISSED** for lack of personal jurisdiction.

### *Conclusion*

Defendants' Unopposed Motion for Leave to Exceed Page Limits in their Joint Reply Brief [87] is **GRANTED** *nunc pro tunc.*

Defendant Alcoa, Inc.'s Motion to Dismiss for Failure to State a Claim, or in the Alternative, Motion for a More Definite

---

11. Significantly, Plaintiffs do not state, and the record does not reflect, that they have already submitted such discovery requests to Axsys during the course of this litigation. *See Posner v. Essex Ins. Co.,* 178·F.3d 1209, 1214 n. 7 (11th Cir.1999) (plaintiff has qualified right to jurisdictional discovery only if discovery is underway at the time court rules on motion to dismiss).

Statement [5], Defendant Lockheed Martin Corporation's Motion to Dismiss or, in the Alternative, for a More Definite Statement [8], Motion of Defendant McCann Aerospace Machining Corporation to Dismiss Plaintiffs' Complaint/Motion for More Definite Statement, or in the Alternative, Motion for Judgment on the Pleadings [31], and Schmiede Corporation's Motion to Dismiss or, in the Alternative, for a More Definite Statement [57], to the extent such motions seek to compel a more definite statement from Plaintiffs, are **GRANTED in part and DENIED in part**. Plaintiffs are **ORDERED**, within twenty (20) days from the date appearing on this Order, to amend their pleading: (1) to include factual allegations respecting whether Plaintiffs were exposed to each individual Defendant's beryllium-containing products; (2) to include approximate date ranges of the alleged exposure; and (3) to segregate out those Plaintiffs who have endured only subclinical, cellular, and subcellular effects from those who have sustained actionable tort injuries.

Defendant Lockheed Martin Corporation's Motion for Judgment on the Pleadings as to Plaintiff's Medical Monitoring, Strict Liability (Ultrahazardous Activity), Increased Risk and Fear Claims [17], Defendant Alcoa Inc.'s Motion for Judgment on the Pleadings as to Plaintiffs' Claims for Medical Monitoring, Strict Liability (Ultra–Hazardous Activity), and Increased Risk and Fear [18], Defendant Brush Wellman Inc.'s Motion for Judgment on the Pleadings Based on Plaintiffs' Lack of Any Cognizable Injury [22], Motion of Defendant McCann Aerospace Machining Corporation to Dismiss Plaintiffs' Complaint/Motion for More Definite Statement, or in the Alternative, Motion for Judgment on the Pleadings [31], and Schmiede Corporation's Motion to Dismiss or, in the Alternative, for a More Definite Statement [57], to the extent they seek dismissal of Plaintiffs' claims for reasons other than imprecise pleading, are **GRANTED in part and DENIED in part**. To the extent Defendants seek to preclude Plaintiffs' recovery for "sub-clinical, cellular, and subcellular" injuries, their motions are due to be granted. Plaintiffs are directed, in conformity with the ruling announced above, to amend their pleading to segregate out those Plaintiffs who have endured only subclinical, cellular, and subcellular effects from those who have sustained actionable tort injuries. Following the amendment, the Court will enter an Order dismissing the claims asserted by the former subset of claimants. Likewise, to the extent Plaintiffs enduring only such "injuries" bring claims for increased risk and emotional distress, such claims are **DISMISSED**. In addition, Count I of Plaintiffs' Complaint, seeking the creation of a medical monitoring fund, is **DISMISSED**. However, insofar as Defendants seek the wholesale dismissal of Count IV of Plaintiffs' Complaint, their motions to dismiss are **DENIED**.

Finally, Defendant Axsys Technologies Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction [28] is **GRANTED**. Plaintiffs' claims against Axsys are **DISMISSED** for lack of personal jurisdiction.