Paula BRAZIL, Plaintiff

v.

JANSSEN RESEARCH & DEVELOP-
MENT LLC f/k/a Johnson and John-
son Pharmaceutical Research and De-
velopment LLC, et al., Defendants.

CIVIL ACTION NO. 4:15-CV-0204-HLM

United States District Court,
N.D. Georgia, Rome Division.

Signed March 24, 2016

Adam A. Edwards, Justin G. Day, Mark E. Silvey, Greg Coleman Law PC, Knoxville, TN, for Plaintiff.

Christiana C. Jacxsens, Greenberg Traurig, LLP, Atlanta, GA, for Defendants.

## ORDER

HAROLD L. MURPHY, UNITED STATES DISTRICT JUDGE

This case is before the Court on Defendants' Motion to Dismiss [10].

## I. Background

### A. Plaintiff's Allegations

#### 1. The Parties

Plaintiff is a citizen of the State of Georgia and resides in Dalton, Whitfield County, Georgia. (Compl. (Docket Entry No. 1) ¶ 3.)

Defendant Janssen Research & Development LLC, formerly known as Johnson and Johnson Pharmaceutical Research and Development LLC ("Defendant Janssen R & D"), is a limited liability company organized under the laws of New Jersey with its principal place of business in New Brunswick, New Jersey. (Compl. ¶ 7.) Plaintiff alleges that Defendant Janssen R & D "is involved in the research, development, sales, and marketing of pharmaceutical products including Invokana." (Id.) Defendant Janssen R & D's sole member is Defendant Janssen Pharmaceuticals, Inc. ("Defendant Janssen Pharmaceuticals"). (Id.) Defendant Janssen Pharmaceuticals is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. (Id. ¶¶ 7, 9.) According to Plaintiff, Defendant Janssen Pharmaceuticals "is involved in the research, development, sales, and/or marketing of pharmaceutical products including Invokana," and "at all relevant times, . . . was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute the drug Invokana for treatment of type 2 diabetes." (Id. ¶ 9.)

Defendant Johnson & Johnson Company ("Defendant J & J") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. (Compl. ¶ 8.) Plaintiff alleges that, at all relevant times, "Defendant J & J was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Invokana." (Id.)

Defendant Janssen Ortho LLC ("Defendant Janssen Ortho") is a Delaware limited liability company with its principal place of business in Puerto Rico. (Compl. ¶ 10.) Plaintiff claims that "at all relevant times, Defendant, Janssen Ortho, was in the business of and did design, research, manufac-

ture, test, advertise, promote, market, sell, and distribute the drug Invokana for use as a drug to treat type 2 diabetes." (Id.) The only member of Defendant Janssen Ortho is OMJ PR Holdings, which is incorporated in Ireland and has its principal place of business in Puerto Rico. (Id.) Defendant Mitsubishi Tanabe Pharma Corporation ("Defendant Mitsubishi") is a Japanese corporation with its principal place of business in Osaka, Japan. (Id. ¶ 11.) According to Plaintiff, Defendant Mitsubishi first developed Invokana and later licensed it to Janssen Pharmaceuticals. (Id.) Defendants John Does 1-5 are unknown corporations or other legal entities, (Id. ¶ 12.)

### 2. Development of Invokana

According to Plaintiff, "Defendants" manufactured, marketed, advertised, distributed, promoted, labeled, tested, and sold Invokana as a drug to treat type 2 diabetes. (Compl. ¶ 13.) The United States Food and Drug Administration ("FDA") approved Invokana on March 29, 2013 for use to improve glycemic control in adults with type 2 diabetes. (Id. ¶ 14.) Invokana was the first of a new class of antidiabetic drugs known as sodium glucose co-transporter 2 ("SGLT2") inhibitors, which work by blocking the reabsorbtion of glucose by the kidney, increasing glucose excretion, and lowering blood glucose levels for diabetics who have elevated blood glucose levels. (Id. ¶ 15.) Plaintiff states that Defendants' marketing materials represent Invokana as a once-a-day pill "that is 'proven to lower blood sugar (A1C).'" (Id. ¶ 16.) According to Plaintiff, Defendants advertise that Invokana "'may help you lose weight'" even though they also "explicitly state that Invokana is not a weight-loss drug." (Id.)

According to Plaintiff, on May 15, 2015, the FDA warned that treatment with SGLT2 inhibitors, including Invokana, could lead to serious complications, including diabetic ketoacidosis. (Compl. ¶ 17.) Diabetic ketoacidosis is a condition where high levels of acid accumulate in the blood and occurs when the body does not have enough insulin to manage glucose levels. (Id.) As a result, the body begins burning fatty acids, creating a waste product called ketones, which trigger the symptoms of ketoacidosis, including nausea, vomiting, abdominal pain, confusion, fatigue, and sleeplessness. (Id.) Plaintiff alleges that other complications associated with Invokana include heart attack, kidney failure, kidney impairment, kidney stones, urinary tract infections, and abnormal weight loss. (Id.)

Plaintiff states that the FDA has identified twenty cases reported as diabetic ketoacidosis, ketoacidosis, or ketosis in patients treated with SGLT2 inhibitors from March 2013 to June 6, 2014, and all of those patients required emergency room visits or hospitalization. (Compl. ¶ 18.) According to Plaintiff, this information was not on the warnings section of the Invokana warning label. (Id.) Plaintiff claims that this lack of warning resulted in patients using Invokana and doctors prescribing Invokana without sufficient information to make an informed decision. (Id.) According to Plaintiff, the Institute for Safe Medication Practices' (the "ISMP") May 6, 2015 edition of Quarter Watch warns about a number of adverse reactions that have been reported about Invokana. (Id. ¶ 19.) According to the ISMP, 450 serious adverse event reports were filed in the first year after Invokana was related, and many of those were related to kidney failure, including fifty-four reports of kidney failure or impairment, fifty-four cases of severe dehydration or fluid imbalance, eleven cases of kidney stones, and fifty-two cases of abnormal weight loss. (Id.)

Plaintiff alleges that Defendants' warning information for Invokana does not ad-

dress the increased risk of diabetic ketoacidosis or kidney failure and only states that a possible side effect of Invokana is "'kidney problems.'" (Compl. ¶ 20.) Plaintiff claims that Invokana was defective and, as a result, people who consumed it, even for a brief period of time, were at an increased risk for developing serious complications, including ketoacidosis. (Id. 21.) Plaintiff claims that Defendants withheld knowledge that Invokana can cause serious complications, including diabetic ketoacidosis, from Plaintiff, other consumers, their physicians, and the public at large. (Id. ¶ 22.) Plaintiff suggests that other safer alternatives to Invokana were available to treat type 2 diabetes. (Id. ¶ 23.) Plaintiff alleges that Invokana is unreasonably dangerous and defective as formulated. (Id. ¶ 25.) Plaintiff claims that Defendants knew or should have known that Invokana was associated with serious complications and could cause diabetic ketoacidosis. (Id. ¶ 26.)

According to Plaintiff, Defendants continue to promote Invokana as a safe and effective treatment for people with type 2 diabetes, despite knowing about the risks associated with it. (Compl. ¶ 27.) In 2014, $19.8 million was spent marketing Invokana to doctors and hospitals, which represents the second highest amount spent for marketing any pharmaceutical drug that year. (Id. ¶ 28.) Plaintiff states that Defendant J & J reported 2014 domestic sales of Invokana in the amount of $569 million and as of June 2015 domestic sales had reach a total amount of $266 million. (Id. ¶ 29.)

### 3. Plaintiff's Use of Invokana

Plaintiff suffers from type 2 diabetes, and began using Invokana, as prescribed by her physician, to treat her diabetes on October 21, 2013. (Compl. ¶¶ 4, 31.) After using Invokana, Plaintiff began losing weight and suffered nausea and vomiting. (Id. ¶¶ 5, 32.) On or around November, 3, 2013, Plaintiff was admitted to Hamilton Medical Center to treat her nausea and vomiting and was diagnosed with diabetic ketoacidosis. (Id. ¶¶ 5, 32.) Plaintiff claims that, had Defendants properly disclosed the risks associated with Invokana, she would not have used it because safer alternatives were available. (Id. ¶ 32.)

### 4. Plaintiff's Claims

Count I of Plaintiff's Complaint is a strict liability claim. (Compl. ¶¶ 33-48.) In Count II, Plaintiff alleges a design defect claim. (Jd. ¶¶ 49-54.) Count III makes a failure to warn claim. (Id. ¶¶ 55-62.) Count IV alleges that Defendants were negligent. (Id. ¶¶ 63-68.) In Count V, Plaintiff claims that Defendants breached an express warranty. (Id. ¶¶ 69-73.) In Count VI, Plaintiff claims that Defendants breached an implied warranty. (Id. ¶¶ 74-79.) Count VII is a claim for fraud. (Id. ¶¶ 80-87.) Count VIII is a fraudulent misrepresentation claim. (Id. ¶¶ 88-96.) In Count IX, Plaintiff brings a fraudulent concealment claim. (Id. ¶¶ 97-105.) Count X is a negligent misrepresentation claim. (Id. ¶¶ 106-11.) In Count XI, Plaintiff alleges that Defendants violated the Georgia Fair Business Practices Act of 1975, O.C.G.A. § 10–1–390, et seq. (Id. ¶¶ 112-23.) Finally, in Count XII, Plaintiff requests an award of punitive damages. (Id. ¶¶ 124-29.)

### B. Procedural Background

Plaintiff filed this case on October 29, 2015. (Docket Entry No. 1.) On January 7, 2016, Defendants Janssen Ortho, Janssen Pharmaceuticals, Janssen R & D, and J & J (collectively "Defendants")[1], filed their Motion to Dismiss. (Docket Entry No. 10.)

---

1. According to Defendants, Defendant Mitsubishi has not been served and this Motion is therefore not brought on behalf of Defendant Mitsubishi. (Br. Supp. Mot. Dismiss (Docket Entry No. 10-1) at 1 n.1.)

The briefing process for that Motion is now complete, and the Court finds that the matter is ripe for resolution.

## II. Discussion

### A. Personal Jurisdiction over Defendant Johnson and Johnson

#### 1. Standard Governing a 12(b)(2) Motion to Dismiss

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1257 (11th Cir.2010) (quoting United Techs. v. Mazer, 556 F.3d 1260, 1274 (11th Cir.2009)). "Where...the Defendant challenges jurisdiction by submitting affidavit evidence in support of its position 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" Id. (quoting Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1269 (11th Cir.2002)). The Court "accept[s] the allegations stated in the complaint as true for purposes of resolving the jurisdictional issue" to the extent such factual allegations are not contradicted by the defendant's affidavits. Posner v. Essex Ins. Co., 178 F.3d 1209, 1215 (11th Cir.1999). "Where the Plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." Meier, 288 F.3d at 1269.

Determining whether a federal court sitting in diversity can exercise jurisdiction over a non-resident defendant is a two-step inquiry. Diamond, 593 F.3d at 1257. "[T]he exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Id. at 1257–58 (internal quotation marks omitted) (quoting United Techs., 556 F.3d at 1274).

#### 2. Personal Jurisdiction under the Georgia Long-Arm Statute

■ The Court first must determine whether the Georgia long-arm statute would allow the Court to exercise jurisdiction over Defendants. "'When a federal court uses a state long-arm statute, because the extent of the statute is governed by state law, the federal court is required to construe it as would the state's supreme court.'" Diamond Crystal Brands, Inc., 593 F.3d at 1258 (quoting Lockard v. Equifax, Inc., 163 F.3d 1259, 1265 (11th Cir.1998)). The Court consequently "must interpret and apply Georgia's long arm statute in the same way as would the Georgia Supreme Court." Id. Given the precedents from the Georgia Supreme Court, "the Georgia long-arm statute does not grant courts in Georgia personal jurisdiction that is coextensive with procedural due process," and, instead, "must be read literally." Id. at 1259. "[The Georgia long-arm statute] imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." Id.

Georgia's long-arm statute provides, in relevant part:

A court of this state may exercise personal jurisdiction over any nonresident or his or her executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she:

(1) Transacts any business within this state;

(2) Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act;

(3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

(4) Owns, uses, or possesses any real property situated within this state; . . . .

■ O.C.G.A. § 9–10–91. "It is beyond cavil that the exercise of personal jurisdiction in Georgia requires a court to find that at least one prong of the long-arm statute is satisfied." Diamond Crystal Brands, Inc., 593 F.3d at 1260. "[T]o satisfy the long-arm statute, a nonresident defendant must do certain acts within the state of Georgia." Id. (internal quotation marks and citation omitted).

Defendants contend that exercising jurisdiction over Defendant J & J would be inappropriate under the Georgia long-arm and would violate due process. (Br. Supp. Mot. Dismiss at 3-9.) Plaintiff and Defendants agree that the only subsection three of the Georgia long-arm statute is potentially applicable. (See Id., at 4-5; Resp. Mot. Dismiss (Docket Entry No. 18) at 1-4; Reply Mot. Dismiss (Docket Entry No. 19) at 2.) The Court therefore only addresses O.C.G.A. § 9–10–91(3).

Defendants argue that Plaintiff has not shown that O.C.G.A. § 9–10–91(3) applies to Defendant J & J because she has not demonstrated that Defendant J & J regularly does business or derives substantial revenue from Georgia. (Reply Mot. Dismiss at 2.) According to Defendants, Defendant J & J is a holding company and does not manufacture or sell Invokana or any other product. (Br. Supp. Mot. Dismiss at 2-4, 3 n.2 (citing Johnson & Johnson 2014 Form 10-k, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, http://www.sec.gov/Archives/edgar/data/200406/000020040615000004/a2014122810-k.htm).) Defendants also argue that the other Defendants' contacts with Georgia cannot be attributed to Defendant J & J. (Id. at 4-5.) Plaintiff claims that "personal jurisdiction over Defendants exists because they engaged in a persistent course of conduct by manufacturing and packaging medication sold in Georgia and derived substantial revenue from the sale of their products in the State of Georgia." (Resp. Mot. Dismiss at 3.)

As an initial matter, the Court addresses the lack of specificity in many of the Complaint's allegations. In the Complaint, Plaintiff's factual allegations often refer to "Defendants" as taking some action without specifying the role or acts of any individual Defendant. (See e.g., Compl. ¶¶ 13, 16, 21-22, 26-30.) In each Count, Plaintiff continues to refer only to "Defendants." These factual allegations lack any specificity that could be used to sustain Plaintiff's initial burden of showing Defendant J & J's minimum contacts with the State of Georgia. See Kinslow v. Pullara, 538 F.3d 687, 692-93 (7th Cir.2008) (finding a lack of minimum contacts because of the plaintiff's "failure throughout this litigation to look at each separate person's contacts with Illinois and his assumption that the defendants could instead be treated as a group"); Goodwin v. Bruggeman–Hatch, No. 13–CV–02973–REB–MEH, 2014 WL 4243822, at *1 (D.Colo. Aug. 27, 2014) ("Plaintiff's sweeping, undifferentiated references to groups of defendants (or even more globally to 'defendants' generally) are insufficient to [ ] establish personal jurisdiction under this (or any) theory.");

Curley v. N. Am. Man Boy Love Ass'n, No. CIV.A.00CV10956GAO, 2001 WL 1822730, at *3 (D.Mass. Sept. 27, 2001) (applying Massachusetts law and finding: "It is not sufficient to allege, without differentiating among defendants, that 'defendants' generally performed certain acts that brought them within the scope of the long-arm jurisdiction of the Court. Each defendant is entitled to an individual evaluation of his claim that the Court lacks jurisdiction over his person."). Plaintiff has alleged no facts, specific to Defendant J & J, showing Defendant J & J's contacts with the State of Georgia.

Plaintiff has alleged that Defendant J & J reported what is clearly substantial income from the sale of Invokana. Plaintiff has not, however, alleged that any substantial amount of that income came from Georgia. Plaintiff has also not alleged that Defendant J & J, as opposed to one of the other Defendants, received that money from Georgia.

Plaintiff has also not made a sufficient showing to impute the contacts of the other Defendants to Defendant J & J. " 'It is well established that as long as a parent and a subsidiary are separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other.' " Andrews v. Mazda Motor Corp., No. 1:14–CV–03432–WSD, 2015 WL 1851159, at *5 (N.D.Ga. Apr. 22, 2015) (quoting Consol. Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1293–94 (11th Cir. 2000)). "Under Georgia law, 'ownership of a subsidiary by an out-of-state parent corporation without more is insufficient to obtain [personal] jurisdiction of the parent corporation.' " Id. (alteration in original) (quoting Drumm Corp. v. Wright, 326 Ga.

App. 41, 46, 755 S.E.2d 850, 855 (2014)). "For a court to exercise personal jurisdiction over a parent because of its subsidiaries' activities, a plaintiff must show that the corporate form was simply a formality, and that the incorporation of the subsidiaries 'was a sham or that it was used to defeat a public convenience, to justify wrong, protect fraud, defend crime, or any other reason which in equity and good conscience would justify the disregard of the corporate entities.' " Id. (quoting Yukon Partners, Inc. v. Lodge Keeper Grp., Inc., 258 Ga.App. 1, 6, 572 S.E.2d 647, 651–52 (2002)).

Plaintiff has made no such showing. There is no evidence in the record and no factual allegations in the Complaint even suggesting that Defendant J & J exercised such control over the other entities that their contacts should be imputed to Defendant J & J.[2] In fact, Defendants' evidence indicates that Defendant J & J consists of a number of subsidiaries, each with its own management groups that are "responsible for their own strategic plans, as well as the day-to-day operations of those companies." (*Johnson & Johnson 2014 Form 10-k.*)

The cases cited by Plaintiff support the conclusion that there is not enough evidence in this case for the Court to exercise jurisdiction over Defendant J & J under the Georgia long-arm statute. In Showa Denko K.K. v. Pangle, 202 Ga.App. 245, 414 S.E.2d 658 (1991), the Court of Appeals of Georgia found that OCGA § 9–10–91(3) permitted jurisdiction over a foreign manufacturer when the manufacturer's agent sold the product to customers in nine different states that were nationally marketed brands, which allowed the Georgia appellate court to conclude that the manufacturer knew the goods would be

---

**2.** The Court notes that it is not even clear from the Complaint that Defendant J & J owns any of the other entities.

resold in Georgia and thus a sufficient contact with Georgia existed. 202 Ga.App. at 246–47, 414 S.E.2d at 660. In this case, the evidence does not show that Defendant J & J was the manufacturer of Invokana; nor does it show that Defendant Janssen Pharmaceuticals or any other entity was the agent or alter ego of Defendant J & J. This case also lacks specific factual allegations over where Invokana was sold, although one could assume that it was sold nationwide. In Cont'l Research Corp. v. Reeves, 204 Ga.App. 120, 419 S.E.2d 48 (1992), there was a detailed factual record showing, among other things, that the manufacturer's representatives sold and promoted the product in Georgia and that the manufacturer knew its wholesale customer had outlet stores in Georgia. 204 Ga.App. at 122–23, 419 S.E.2d at 51. There are no such factual allegations or evidence in this case. Finally, in Betancourt v. Endo Pharm., Inc., No. 1:11–CV–3805–SCJ, 2014 WL 10677480 (N.D.Ga. Dec. 17, 2014), the court found that the plaintiff established a prima facie case of jurisdiction under the Georgia long-arm statute and that, because the defendants' affidavit did not contradict the jurisdictional allegations of the complaint, jurisdiction was permissible. 2014 WL 10677480, at *4–5. In that case, however, there were at least some more detailed factual allegations, and, in this case, Defendants' evidence that Defendant J & J is not a manufacturer directly contradicts the jurisdictional allegations of the Complaint. These cases are therefore distinguishable from the present case.[3]

. There is an insufficient factual basis for this Court to conclude that it can exercise jurisdiction over Defendant J & J pursuant to subsection three of the Georgia long-arm statute. The Court therefore grants this portion of the Motion to Dismiss.

### 3. Personal Jurisdiction under the Fourteenth Amendment

"The Due Process Clause protects an individual's liberty interest in not being subject to binding judgments imposed by foreign sovereigns." Diamond Crystal Brands, Inc., 593 F.3d at 1267. "The heart of this protection is fair warning—the Due Process Clause requires 'that the defendant's conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there.'" Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (alteration in original) (internal quotation marks omitted)). Courts "have differentiated between general or all-purpose jurisdiction, and specific or case-linked jurisdiction." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011). "A court may assert general jurisdiction over foreign (sister-state or foreign country) [residents] when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." Id. (internal quotation marks and citation omitted). "Specific jurisdiction on the other hand, depends on an affiliatio[n] between the forum and the underly-

---

**3.** Plaintiff suggests that it may be possible to demonstrate the necessary facts to show jurisdiction after discovery and that it would be premature to dismiss Defendant J & J. (Resp. Mot. Dismiss at 8 n. 1.) Plaintiff, however, has not made a proper request for jurisdictional discovery and has not pursued any discovery from Defendants. See e.g., Mother Doe I v. Al Maktoum, 632 F.Supp.2d 1130, 1146 (S.D.Fla.2007) ("The 'requests' for jurisdic-

tional discovery contained in Plaintiffs' memoranda in opposition to Defendants' Motion to Dismiss are not a substitute for the issuance of discovery requests or the filing of a formal motion to take discovery. If jurisdictional discovery is what Plaintiffs wanted, it is altogether unclear why they agreed with Defendants' not to take any discovery until after the Court ruled on Defendants' Motion to Dismiss.").

ing controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." Id. (alteration in original) (internal quotation marks and citation omitted).

### a. General Jurisdiction

■ It is entirely clear in this case that the Court does not have general jurisdiction over Defendant J & J. For general jurisdiction to apply, the plaintiff must demonstrate that the nonresident defendant's contacts with the forum state are "continuous and systematic." Borg–Warner Acceptance Corp. v. Lovett & Tharpe, Inc., 786 F.2d 1055, 1057 (11th Cir.1986). General jurisdiction allows a court "to hear any and all claims against" a foreign corporation only when their continuous and systemic contacts with the forum "render them essentially at home in the forum State." Daimler AG v. Bauman, —— U.S. ——, 134 S.Ct. 746, 754, 187 L.Ed.2d 624 (2014) (quoting Goodyear, 131 S.Ct. at 2851) (internal quotation marks omitted). "As International Shoe [Co. v. State of Wash., Office of Unemployment Comp. & Placement, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)] itself teaches, a corporation's 'continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" Id. at 757 (quoting Int'l Shoe, 326 U.S. at 318, 66 S.Ct. 154).

■ Plaintiff appears to concede that general jurisdiction does not apply in this case. (Resp. Mot. Dismiss at 5-8.) From the allegations of the Complaint and the evidence submitted by Defendants, it appears that Defendant J & J is at home only in the State of New Jersey. As far as the Court can tell, it does not have offices, employees, bank accounts, or other assets in the State of Georgia and cannot be said to be at home in this forum.

### 2. Specific Jurisdiction

■ "In specific jurisdiction cases, the 'fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum ... and the litigation results from alleged injuries that arise out of or relate to those activities.'" Diamond Crystal Brands, Inc., 593 F.3d at 1267 (quoting Burger King, 471 U.S. at 472–73, 105 S.Ct. 2174 (omission in original)). "Put differently, the defendant must have 'purposefully availed' itself of the privilege of conducting activities—that is, purposefully establishing contacts—in the forum state and there must be a sufficient nexus between those contacts and the litigation." Id.

■ Plaintiff relies on the "stream of commerce" theory to demonstrate specific personal jurisdiction over Defendant J & J. (Resp. Mot. Dismiss at 6-8.) "The Supreme Court has held that 'placing goods into the stream of commerce 'with the expectation that they will be purchased by consumers within the forum State' may indicate purposeful availment' of that state's laws, so that personal jurisdiction over a non-resident defendant may be appropriate." Atlantis Hydroponics, Inc. v. Int'l Growers Supply, Inc., 915 F.Supp.2d 1365, 1373 (N.D.Ga.2013) (quoting J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 131 S.Ct. 2780, 2788, 180 L.Ed.2d 765 (2011) (plurality)). In Nicastro, "a plurality of the Supreme Court recently held that there was no personal jurisdiction over a foreign defendant based on a distribution agreement to sell the defendant's products in the United States, official attendance by defendant at annual conventions to advertise its products, and the sale of four machines, including one that caused the Plaintiff's injuries." Websters Chalk Paint

Powder, LLC v. Annie Sloan Interiors, Ltd., No. 1:13–CV–2040–WSD, 2014 WL 4093669, at *9 (N.D.Ga. Aug. 18, 2014). "The plurality found that these alleged contacts with the forum state did not establish that defendant 'engaged in conduct purposefully directed at New Jersey' to confer specific jurisdiction under the Due Process Clause." Id. (quoting Nicastro, 131 S.Ct. at 2788). Applying Nicastro, the district court in Websters concluded first that jurisdiction over the defendant was not permitted when "Plaintiff has not alleged any facts, such as the volume of ASI's sales in Georgia or direct advertising of ASI's products in Georgia, to suggest that ASI has purposefully availed itself of the benefit of Georgia's laws." Id.

 In this case, Plaintiff has not alleged any facts showing that Defendant J & J purposefully availed itself of the benefit of Georgia laws. Again, Plaintiff has not contested Defendants' evidence showing that Defendant J & J is not the manufacturer of Invokana and instead is a holding company. The cases cited by Plaintiff address jurisdiction over a manufacturer. Moreover, to impute the contacts of Defendant J & J's subsidiaries to Defendant J & J, Plaintiff would need to show that the subsidiaries' "corporate existence was simply a formality." Consol. Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1294 (11th Cir.2000); see also Parker v. Brush Wellman, Inc., 377 F.Supp.2d 1290, 1304 (N.D.Ga.2005) ("In order to exercise personal Jurisdiction over a parent company by virtue of [its] subsidiary's activities within or affecting the forum state, the parent must have exercised an unusually high degree of control over the subsidiary."). Plaintiff has not even undertaken to make that showing.

Given the minimal factual allegations of the Complaint, coupled with Defendants' evidence, the Court finds that, at this point, exercising jurisdiction over Defendant J & J would violate the due process clause of the Fourteenth Amendment. The Court therefore grants this portion of Defendants' Motion to Dismiss and dismisses the claims against Defendant J & J without prejudice.

## B. Failure to State a Claim
### 1. Standard Governing a 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) allows the Court to dismiss a complaint, or portions of a complaint, for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss, the Court must take the allegations of the complaint as true and must construe those allegations in the light most favorable to the plaintiff. Alvarez v. Attorney Gen. for Fla., 679 F.3d 1257, 1261 (11th Cir.2012).

Although a court is required to accept well-pleaded facts as true when evaluating a motion to dismiss, it is not required to accept the plaintiff's legal conclusions. Chandler v. Sec'y of Fla. Dep't of Transp., 695 F.3d 1194, 1199 (11th Cir.2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). The Court also does not accept as true "unwarranted deductions of fact or legal conclusions masquerading as facts." Snow v. DirecTV, Inc., 450 F.3d 1314, 1320 (11th Cir.2006) (internal quotation marks and citation omitted).

Finally, the Court may dismiss a complaint if it does not plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 708 (11th Cir.2014) (internal quotation marks omitted) (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). In Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the

Supreme Court observed that a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S.Ct. 1955. Although factual allegations in a complaint need not be detailed, those allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. Moreover, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. The mere possibility that the defendant might have acted unlawfully is not sufficient to allow a claim to survive a motion to dismiss. Id. Instead, the well-pleaded allegations of the complaint must move the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570, 127 S.Ct. 1955.

## 2. Initial Matters

■■■■ As an initial matter, Plaintiff's Complaint is a shotgun complaint. A complaint is a shotgun complaint where "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." Anderson v. District Bd. of Trustees of Cent. Fla. Comm. College, 77 F.3d 364, 366 (11th Cir.1996). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1323 (11th Cir.2015). A complaint also is a shotgun pleading where it "lumps multiple claims together in one count and, moreover, appears to support a specific, discrete claim with allegations that are immaterial to that claim." Ledford, 657

F.3d at 1239. "When faced with a complaint... in which the counts incorporate by reference all previous allegations and counts, the district court must cull through the allegations, identify the claims, and, as to each claim identified, select the allegations that appear to be germane to the claim." Id. "This task can be avoided if the defendant moves the court for a more definite Statement or if the court, acting on its own initiative, orders a repleader." Id.

■■■■ The first paragraph of each Count of the Complaint incorporates "each and every paragraph" of the Complaint into the Count. According to the Eleventh Circuit, "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint" is "[t]he most common type" of shotgun pleadings. Weiland, 792 F.3d at 1321. The Complaint provides little notice of which factual allegations support which claims. It is not clear what the basis is for each Count and it seems that some of the Counts may overlap. Additionally, the Complaint gives no guidance as to which Defendants committed which acts.

■■■■ As the Court discusses infra, Plaintiff's failure to provide just a little bit more specificity is detrimental to meeting the pleading standard for some of her claims. Plaintiff's Complaint is far from the most egregious shotgun Complaint this Court has seen and can certainly be replead to meet the pleading requirements of the Federal Rules of Civil Procedure. "Where, as here, the plaintiff asserts multiple claims for relief, a more definite statement, if properly drawn, will present each claim for relief in a separate count, as required by Rule 10(b), and with such clarity and precision that the defendant will be able to discern what the plaintiff is

claiming and to frame a responsive pleading." Anderson, 77 F.3d at 366 (footnote omitted).

Based on the foregoing reasoning, the Court dismisses Plaintiff's Complaint without prejudice and orders Plaintiff to replead her Complaint within fourteen days of the date of this Order.

### 3. Strict Liability

■ May of Plaintiff's claims fail for similar reasons as those discussed supra Part II.B.2.[4] For instance, Plaintiff's strict liability claim fails to state a claim. O.C.G.A. § 51–1–11(b) states:

> The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.

O.C.G.A. § 51–1–11 (b). To state a claim for strict liability, the plaintiff must show that (1) the defendant was the manufacturer of the product; (2) the product, when sold, was not merchantable and reasonably suited to the use intended, and (3) the product's defective condition proximately caused Plaintiff's injury. Chicago Hardware & Fixture Co. v. Letterman, 236 Ga.App. 21, 23, 510 S.E.2d 875, 877 (1999). ■ Under Georgia law, "[t]here are three general categories of product de-

fects: manufacturing defects, design defects, and marketing/packaging defects." Banks v. ICI Americas, Inc., 264 Ga. 732, 733, 450 S.E.2d 671, 672 (1994).

■ Plaintiff does not allege that any of the Defendants were the manufacturer. Instead, the Complaint generically states that "Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed sold, and distributed Invokana." (Compl. ¶ 36.) The Complaint provides no notice of what role any of the Defendants played. In a previous pharmaceutical product liability case, this Court wrote:

> Plaintiff's allegations are insufficient to state a claim for strict liability under Georgia law. First, Plaintiff does not allege any specific design or manufacturing defect that proximately caused Plaintiff harm. Instead, Plaintiff merely restates the elements of the claim and alleges that phenytoin's "foreseeable risks exceeded the benefits associated with the designs or formulations of the product." Second, Plaintiff does not provide a specific list of injuries, but instead alleges that the injuries include "one or more of the following" injuries. Third, Plaintiff fails to distinguish between Defendants or to specifically allege whether Defendant Caraco or any other Defendant is a manufacturer, distributor, supplier, or seller of the product at issue. Fourth, Plaintiff does not allege that any specific Defendant's Phenytoin caused

---

4. In addition, Plaintiff has abandoned her express warranty and implied warranty claims as Plaintiff has not responded to Defendants' arguments with respect to those claims. Bute v. Schuller Int'l, Inc., 998 F.Supp. 1473, 1477 (N.D.Ga.1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."); Welch v. Delta Air Lines, Inc., 978 F.Supp. 1133, 1137 (N.D.Ga.1997) ("Plaintiff's failure to respond to Defendant's argument alone entitles Defendant to summary judgment on these claims."). The Court therefore dismisses Counts VI and VI.

**1338**

his injuries or that any specific Defendant's Phenytoin product included manufacturing or design defects. Such general, conclusory allegations, devoid of any specific, factual content to support the legal conclusions, are plainly insufficient under *Iqbal.*

Henderson v. Sun Pharm. Indus., Ltd., No. 4:11–CV–0060–HLM, 2011 WL 4024656, at *5 (N.D.Ga. June 9, 2011) (citations omitted). In this case, Plaintiff has alleged a specific injury and has alleged the specific product that caused her injuries. Plaintiff, however, has not alleged any specific design or manufacturing defect. While Plaintiff has pleaded facts that Invokana may cause diabetic ketoacidosis, Plaintiff has not tied that harm to any design or manufacturing defect.[5] Additionally, Plaintiff has not distinguished between any of the Defendants. Instead, Plaintiff's allegations are largely legal conclusions which are insufficient to meet the Twombly/Iqbal standard. See Goodson v. Boston Sci. Corp., No. 1:11–CV–3023–TWT, 2011 WL 6840593, at *4 (N.D.Ga. Dec. 29, 2011) (finding that Plaintiff's allegations that 'the [Defendant's] Products implanted in Plaintiff were not reasonably safe for their intended use and were defective as a matter of law' and that '[a]s a direct and proximate result of the Products' aforementioned defects, Plaintiff was caused ... severe personal injuries' were merely formulaic recitations of the cause of action and insufficient under Twombly); Moore v. Mylan Inc., 840 F.Supp.2d 1337, 1344–45 (N.D.Ga.2012) ("Plaintiff's allegations in her complaint fail to state a claim for strict liability under Georgia law and meet the

pleading standard required by Twombly ... First, plaintiff has not alleged any specific design or manufacturing defect in either Pfizer's or Mylan's products .... Second, because the complaint is silent as to a design or manufacturing defect, the Court cannot draw the reasonable inference that a design or manufacturing defect caused the decedent's injuries."); Schmidt v. CR. Bard. Inc., No. 6:14–CV–62, 2014 WL 5149175, at *3 (S.D.Ga. Oct. 14, 2014) ("[A] bald assertion that the Plug was defective in design when it left Defendants' hands, was unreasonably dangerous, and the foreseeable risks outweighed the Plug's benefits would be insufficient to survive a motion to dismiss.").

### 4. Negligence

 Plaintiff's other claims often suffer from the same flaws. For instance, Plaintiff's negligence claim fails for a lack of specificity as to each Defendant. "Under Georgia law, a plaintiff asserting a negligence claim must prove the following elements: '(1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risk of harm; (2) breach of this standard; (3) a legally attributable causal connection between the conduct and resulting injury; and, (4) some loss or damage flowing to the Plaintiff's legally protected interest as a result of the alleged breach of the legal duty.'" Henderson, 2011 WL 4024656, at *7 (quoting Estate of Thornton v. Unum Life Ins. Co. of Am., 445 F.Supp.2d 1379, 1382 (N.D.Ga.2006)). Plaintiff "does not specify how any specific Defendant breached any duty in connec-

---

5. In Bailey v. Janssen Pharmaceutica, Inc., 288 Fed.Appx. 597, 607 (11th Cir.2008), an unpublished and therefore non-binding but highly persuasive case, the Eleventh Circuit set forth the pleading standard for a pharmaceutical product liability case under Florida law. That case, while instructive, is distinguishable. In that case, the Eleventh Circuit reversed the district court's dismissal with prejudice. Here, the Court is ordering Plaintiff to replead the Complaint. Also, the plaintiff in Bailey provided greater factual allegations, including possible defects that may have existed.

tion with Plaintiff." Id. at *8. While Plaintiff's Complaint generally fairs better than the Complaint in Henderson, Plaintiff's lack of specificity as to the acts of any specific Defendant fails to provide proper notice of her claims to any one Defendant. Plaintiff may utilize alternative pleading, but greater factual specificity is necessary.

Edwards v. Wisconsin Pharmacal Co., LLC, 987 F.Supp.2d 1340 (N.D.Ga.2013), in many ways reaches a different conclusion from the one this Court made in Henderson. Edwards, however, is not binding precedent, and this Court need not follow all of the reasoning in Edwards. While Edwards applied a marginally different interpretation of the federal pleading standard, the court in Edwards reached a similar result as it "require[d] Edwards to file an amended complaint that makes clear which factual allegations apply to each Defendant and that asserts distinct causes of action separately." 987 F.Supp.2d at 1345 (footnote omitted).

### 5. Fraud-based Claims

Count VII of the Complaint alleges a claim for fraud, Count VIII alleges a claim for fraudulent misrepresentation, and Count IX alleges a claim for fraudulent concealment. Each of these Counts makes similar accusations that Defendants knowingly hid the dangers of Inovkana from the health care community and the public at large.

"A plaintiff asserting a fraud claim under Georgia law must establish five elements: (1) a false representation by the defendant; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff, and (5) damage to the plaintiff." Henderson, 2011 WL 4024656, at *6 (citing Johnston v. Correale, 272 Ga.App. 502, 504, 612 S.E.2d 829, 832 (2005)). Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the cir-

cumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To plead a fraud claim with particularity, "a plaintiff must plead facts as to time, place, substance of the defendants alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." Jenkins v. BAC Loan Servicing LP, 822 F.Supp.2d 1369, 1380 (M.D.Ga.2011) (internal quotation marks and citation omitted). "This means that to state an actionable claim for fraud, the plaintiff must state the who, what, when[,] where, and how." Id. (alteration in original) (internal quotation marks and citation omitted).

"Generally, to survive a Rule 9(b) motion, a plaintiff claiming fraud must apprise each defendant of the scope of his or her participation in the alleged fraud." Ackerman v. Nat'l Prop. Analysts, Inc., 887 F.Supp. 494, 505 (S.D.N.Y.1992). A "blanket allegation that 'defendants made representations' without any further specificity is fatal to [a fraud] claim." Fox Fuel, a Div. of Keroscene, Inc. v. Delaware Cnty. Sch. Joint Purchasing Bd., 856 F.Supp. 945, 954 (E.D.Pa.1994). "In a case with multiple defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations lumping multiple defendants together are insufficient." W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc., 287 Fed.Appx. 81, 86 (11th Cir.2008) (internal quotation marks omitted).

Plaintiff's allegations in Counts VII, VIII, and IX fail to meet the pleading requirements of Rule 9(b). Plaintiff does not identify any statements that were misrepresentations. Plaintiff does not indicate which Defendant made any particular statement. In other words, Plaintiff does not state the who, what, when, where, and how of the facts supporting the fraud

claims; nor do Plaintiff's allegations give Defendants notice of what actions they are accused of taking that amount to fraud. In Henderson, the Court found the Plaintiff's allegations of fraud failed to satisfy Rule 9(b)'s particularity requirement under the following circumstances:

> First, Plaintiff does not distinguish between Defendants and does not identify the specific person or even the specific Defendant that allegedly made the fraudulent statements and representations. Second, Plaintiff does not provide any examples of specific fraudulent statements or representations stated by any Defendant. Instead, Plaintiff makes vague, conclusory statements about the falsity of Defendants' representations and the dangers of Phenytoin. Third, Plaintiff fails to state the time, place, or context of any allegedly fraudulent statement or misrepresentation.

Henderson, 2011 WL 4024656, at *6 (footnote omitted). Each of those flaws is present in this case. Plaintiff's allegations of fraud are therefore insufficient under Rule 9(b).

Plaintiff protests that she needs and deserves the benefit of discovery to determine "what representations were or should have been made by the Defendants." (Resp. Mot. Dismiss at 15.) That, however, is not the standard under Rule 9(b). Moreover, discovery should not be necessary to identify the statements made by Defendants that were fraudulent. To sustain a claim for fraud, Plaintiff must have relied on the fraudulent statements. Therefore, Plaintiff must have been aware of those statements before she ever consumed Invokana, and she and her counsel should thus be able to identify those statements in the Complaint without the benefit of discovery. The Court therefore dismisses Plaintiff's fraud-based claims.

### 6. Negligent Misrepresentation

Defendants argue that Plaintiff's Negligent Misrepresentation claim is not viable because it is the same as Plaintiff's failure-to-warn claim, which is itself not viable. (Br. Supp. Mot. Dismiss at 16-17.) Plaintiff counters that she needs discovery to identify "what representations were or should have been made by the Defendants." (Resp. Mot. Dismiss at 15.) Plaintiff does not address the legal basis for her claim, cite any case law, or distinguish the cases cited by Defendants. (Id. at 15-16.) Nor does Plaintiff explain how a negligent misrepresentation claim differs from a failure to warn claim. (Id.) A party that does not respond to arguments with respect a claim abandons that claim. Bute, 998 F.Supp. at 1477; Welch, 978 F.Supp. at 1137. Alternatively, another court in this district has determined that there is no misrepresentation claims for products liability distinct from failure to warn claims. Swicegood v. Pliva, Inc., 543 F.Supp.2d 1351, 1357 (N.D.Ga.2008) ("In the absence of clear precedent, I am not prepared to recognize the viability of misrepresentation claims distinct from products liability or failure to warn claims. In my view, misrepresentation claims against a manufacturer properly collapse into the failure to warn claims.") The Court therefore dismisses Count X of the Complaint.

### 7. Georgia Fair Business Practices Act

"Pursuant to the language of OCGA § 10–1–399(a), however, 'a private FBPA claim has three elements: a violation of the Act, causation, and injury.'" Tiismann v. Linda Martin Homes Corp., 279 Ga. 137, 139, 610 S.E.2d 68, 70 (2005) (quoting Zeeman v. Black, 156 Ga.App. 82, 86–87, 273 S.E.2d 910, 916 (1980)). Once again, Plaintiff's allegations amount merely to restating the elements of the cause of action without any factual support. Plain-

tiff pleads merely that Defendants violated the consumer protection laws through the use of false and misleading misrepresentations. In doing so, Plaintiff provides no factual support for that legal conclusion. Plaintiff's Complaint therefore fails to state a plausible claim for relief.

## C. Preemption

Finally, Defendants contend that Plaintiff's design defect claims are preempted because federal law precludes Defendant manufacturers from redesigning a prescription drug without FDA approval. (Mot. Dismiss at 18-25.) Plaintiff argues that the cases cited by Defendants do not require dismissal and are distinguishable because they only apply to generic, and not brand name, drugs. (Resp. Mot. Dismiss at 19-21.)

■■■■ The Constitution provides that the laws of the United States "shall be the supreme Law of the Land...any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const, art. VI, cl. 2. Based on the Supremacy Clause, the Supreme Court of the United States has "long recognized that state laws that conflict with federal law are 'without effect.'" Altria Grp., Inc. v. Good, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (quoting Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). When conducting an inquiry into pre-emption by federal law, "'the ultimate touchstone' in every pre-emption case" is the purpose of Congress. Id. (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). There are generally three types of preemption: (1) express preemption, which "arises when the text of a federal statute explicitly manifests Congress's intent to displace state law," (2) field preemption, which "'occurs when a congressional legislative scheme is so per-

vasive as to make the reasonable inference that Congress left no room for the states to supplement it,'" and (3) conflict preemption. United States v. Alabama, 691 F.3d 1269, 1281 (11th Cir.2012) (quoting Florida State Conference of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1167 (11th Cir. 2008)).

■■■■ "'Conflict preemption exists where state law actually conflicts with federal law, making it impossible to comply with both, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Griffith v. Gen. Motors Corp., 303 F.3d 1276, 1279 (11th Cir.2002) (quoting Irving v. Mazda Motor Corp., 136 F.3d 764, 768 (11th Cir.1998)) (internal quotation marks omitted). "[T]wo cornerstones'" guide the extent to which federal laws preempt state laws: the purpose of Congress" and the assumption "'that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" Alabama, 691 F.3d at 1282 (quoting Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)).

In a series of three decisions in recent years, the Supreme Court has addressed the conflict preemption of FDA regulations to state law product liability claims against pharmaceutical drug manufacturers. The first of these three cases was Wyeth v. Levine, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009). In Levine, the plaintiff successfully brought a failure to warn claim in a Vermont state court against a drug manufacturer. Levine, 555 U.S. at 558, 129 S.Ct. 1187. The FDA had previously approved the warning label attached to the drug. Id. The Supreme Court concluded that Wyeth "failed to demonstrate that it was impossible for it to comply with

both federal and state requirements." Id. at 573, 129 S.Ct. 1187.

In conducting the conflict preemption inquiry, the Supreme Court began by examining the duties required by federal law, in the form of FDA regulations, and Vermont state law, in the form of tort liability. The state law duty required Wyeth to strengthen the inadequate warning on its drug. Levine, 555 U.S. at 562, 129 S.Ct. 1187. With respect to the FDA requirements, the Supreme Court found that "[generally speaking, a manufacturer may only change a drug label after the FDA approves a supplemental application" but that there was an exception through "an FDA regulation that permits a manufacturer to make certain changes to its label before receiving the agency's approval." Id. at 568, 129 S.Ct. 1187. This regulation, the "changes being effected," or "CBE," regulation "provides that if a manufacturer is changing a label to 'add or strengthen a contraindication, warning, precaution, or adverse reaction' or to 'add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product,' it may make the labeling change upon filing its supplemental application with the FDA; it need not wait for FDA approval." Id. at 568, 129 S.Ct. 1187 (quoting 21 C.F.R. §§ 314.70(c)(6)(iii)(A), (C)). Based on its reading of FDA regulations, and relevant federal statutes, the Supreme Court found that "it has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times. It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market." Id. at 570–71, 129 S.Ct. 1187. Noting that "[i]mpossibility pre-emption is a demanding defense," the Supreme Court concluded that "[t]he CBE regulation permitted Wyeth to unilaterally strengthen its

warning, and the mere fact that the FDA approved [the drug's] label does not establish that it would have prohibited such a change." Id. at 573, 129 S.Ct. 1187.

In PLIVA. Inc. v. Mensing, 564 U.S. 604, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011), another conflict preemption case, the Supreme Court dealt with whether FDA regulations preempted a failure to warn claim against a manufacturer of the generic version of metoclopramide. After reviewing relevant FDA regulations, the Supreme Court found that "brand-name and generic drug manufacturers have different federal drug labeling duties. A brand-name manufacturer seeking new drug approval is responsible for the accuracy and adequacy of its label. A manufacturer seeking generic drug approval, on the other hand, is responsible for ensuring that its warning label is the same as the brand name's. PLIVA, Inc. v. Mensing, 564 U.S. 604, 131 S.Ct. 2567, 2574, 180 L.Ed.2d 580 (2011) (citations omitted). In that case, the FDA indicated "that it interprets its regulations to require that the warning labels of a brand-name drug and its generic copy must always be the same—thus, generic drug manufacturers have an ongoing federal duty of 'sameness.'" Id. at 2574–75. According to the FDA's interpretation, the CBE regulation only allows "changes to generic drug labels...when a generic drug manufacturer changes its label to match an updated brand-name label or to follow the FDA's instructions." Id. at 2575. The Supreme Court deferred to the FDA's interpretation of its CBE and generic drug labeling requirements as it was not plainly erroneous or inconsistent with the regulation. Id. According to the FDA, "[g]eneric drug manufacturers that become aware of safety problems must ask the agency to work toward strengthening the label that applies to both the generic and brand-name equiv-

alent drug." Id. at 2576. The Supreme Court concluded that impossibility existed because "[i]t was not lawful under federal law for the Manufacturers to do what state law required of them." Id. at 2577. The Supreme Court explained:

> if the Manufacturers had independently changed their labels to satisfy their state-law duty, they would have violated federal law. Taking Mensing and Demahy's allegations as true, state law imposed on the Manufacturers a duty to attach a safer label to their generic metoclopramide. Federal law, however, demanded that generic drug labels be the same at all times as the corresponding brand-name drug labels. See, e.g., 21 CFR § 314.150(b)(10). Thus, it was impossible for the Manufacturers to comply with both their state-law duty to change the label and their federal law duty to keep the label the same.

Id. According to the Court, "it is enough to hold that when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." Id. at 2580–81.

Mensing specifically distinguished itself from Levine. In Mensing, the Supreme Court explained that in Levine the CBE regulation allowed the brand-name drug manufacturer "to comply with both state and federal law" because the manufacturer could " 'unilaterally strengthen its warning' without prior FDA approval." Mensing, 131 S.Ct. at 2581 (quoting Levine, 555 U.S. at 573, 129 S.Ct. 1187). The Court continued, stating: "We recognize that from the perspective of Mensing and Demahy, finding pre-emption here but not in [Levine] makes little sense. Had Mensing and Demahy taken Reglan, the brand-

name drug prescribed by their doctors, [Levine] would control and their lawsuits would not be pre-empted." Id. The Court concluded: "It is beyond dispute that the federal statutes and regulations that apply to brand-name drug manufacturers are meaningfully different than those that apply to generic drug manufacturers.... But different federal Statutes and regulations may, as here, lead to different pre-emption results." Id. at 2582.

In 2013, the Supreme Court addressed preemption of FDA regulations with respect to a design defect claim against a generic drug manufacturer. Mut. Pharm. Co. v. Bartlett, —— U.S. ——, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013). The Supreme Court again laid out the basis for conflict preemption. "The Supremacy Clause provides that the laws and treaties of the United States 'shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' " Bartlett, 133 S.Ct. at 2472–73 (alteration in original) (quoting U.S. Const., Art. VI, cl. 2). "Accordingly, it has long been settled that state laws that conflict with federal law are 'without effect.' " Id. at 2473 (quoting Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). "Even in the absence of an express pre-emption provision, the Court has found state law to be impliedly pre-empted where it is 'impossible for a private party to comply with both state and federal requirements.' " Id. (quoting English v. General Elec. Co., 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)).

In conducting the conflict preemption analysis, the Supreme Court had to determine the duties required by New Hampshire's product liability law and FDA regulations. Based on its reading of FDA regulations, the Supreme Court determined:

Once a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the "qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application." 21 C.F.R. § 314.70(b)(2)(i). Generic manufacturers are also prohibited from making any unilateral changes to a drug's label. See §§ 314.94(a)(8)(iii), 314.150(b)(10) (approval for a generic drug may be withdrawn if the generic drug's label "is no longer consistent with that for [the brand-name] drug").

Bartlett, 133 S.Ct. at 2471. The Supreme Court described New Hampshire law as follows:

New Hampshire requires manufacturers to ensure that the products they design, manufacture, and sell are not "unreasonably dangerous." The New Hampshire Supreme Court has recognized that this duty can be satisfied either by changing a drug's design or by changing its labeling. Since Mutual did not have the option of changing sulindac's design, New Hampshire law ultimately required it to change sulindac's labeling.

Id. at 2474. To determine whether a product is unreasonably dangerous, New Hampshire uses a risk-utility analysis that has three main factors: the usefulness of the drug, whether the risk of danger could be reduced without diminishing the effectiveness or increasing the cost of the drug, and whether a warning could effectively avoid an unreasonable risk of harm. Id. "In the drug context, either increasing the 'usefulness' of a product or reducing its 'risk of danger' would require redesigning the drug: A drug's usefulness and its risk of danger are both direct results of its chemical design and, most saliently, its

active ingredients." Id. at 2475. The Court explained, however, that "redesign was not possible for two reasons. First, the FDCA requires a generic drug to have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug on which it is based.... Second, because of sulindac's simple composition, the drug is chemically incapable of being redesigned." Id. Because the generic drug manufacturer could not comply with its duties under state law "to ameliorate the drug's 'risk-utility' profile" by redesigning the drug without running afoul of FDA regulations, the Court reasoned that "the only way for Mutual to ameliorate the drug's 'risk-utility' profile—and thus to escape liability—was to strengthen 'the presence and efficacy of' " the drug's warning. Id. (quoting Vautour v. Body Masters Sports Indus., Inc., 147 N.H. 150, 154, 784 A.2d 1178, 1182 (2001)). The Court reasoned: "Thus, New Hampshire's design-defect cause of action imposed a duty on Mutual to strengthen sulindac's warnings." Id.

Because the Supreme Court found that New Hampshire's design defect law required the manufacturer to change its warnings, the Court then applied its previous ruling in Mensing to hold that the design defect claim was preempted. Bartlett, 133 S.Ct. at 2476 ("As [Mensing] made clear, federal law prevents generic drug manufacturers from changing their labels.... Thus, federal law prohibited Mutual from taking the remedial action required to avoid liability under New Hampshire law."). "Because it is impossible for Mutual and other similarly situated manufacturers to comply with both state and federal law, New Hampshire's warning-based design-defect cause of action is preempted with respect to FDA-approved drugs sold in interstate commerce." Id. at

2477 (footnotes omitted).[6] In conclusion the Court reiterated its reasoning:

> Here, as we have tried to make clear, the duty to ensure that one's products are not "unreasonably dangerous" imposed by New Hampshire's design-defect cause of action, *Vautour*, 147 N.H. at 153, 784 A.2d at 1181, involves a duty to make one of several changes. In cases where it is impossible—in fact or by law—to alter a product's design (and thus to increase the product's "usefulness" or decrease its "risk of danger"), the duty to render a product "reasonably safe" boils down to a duty to ensure "the presence and efficacy of a warning to avoid an unreasonable risk of harm from hidden dangers or from foreseeable uses." *Id.*, at 154, 784 A.2d at 1182.

*Id.* at 2480. The Supreme Court finished, stating that it "would welcome Congress' 'explicit' resolution of the difficult preemption questions that arise in the prescription drug context. That issue has repeatedly vexed the Court—and produced widely divergent views—in recent years." *Id.*

▆▆▆▆ As *Levine*, *Mensing*, and *Bartlett* make clear, the conflict preemption analysis turns on the duties imposed by state law, the Court thus turns next to the duties imposed under Georgia law by a design defect claim. The Georgia Supreme Court has adopted the risk-utility analysis for design defects. *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 735, 450 S.E.2d 671, 674 (1994). The Georgia Supreme Court "has recognized that there is no significant dis-

tinction between negligence and strict liability for purposes of the risk-utility analysis." *Jones v. NordicTrack, Inc.*, 274 Ga. 115, 118 n.5, 550 S.E.2d 101, 105 n. 5 (2001). Under the risk-utility analysis, "a product design is defective if the risks inherent in a product design [outweigh] the utility or benefit derived from the product." *In re Mentor Corp. ObTape Transobturator Sling Products Liab. Litig.*, 711 F.Supp.2d 1348, 1364 (M.D.Ga. 2010) (alteration in original) (internal quotation marks and citation omitted). The Georgia Supreme Court has determined that a number of factors may be considered when conducting a risk-utility analysis, including:

> ▆▆▆▆ the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance.

*Banks*, 264 Ga. at 736 n. 6, 450 S.E.2d at 675 n. 6 (emphasis added). Georgia's risk-utility analysis for design defect claims closely resembles the analysis used by

---

**6.** In so holding, the Court made clear that it did "not address state design-defect claims that parallel the federal misbranding statute. The misbranding statute requires a manufacturer to pull even an FDA-approved drug from the market when it is 'dangerous to health' even if 'used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.'" *Id.* at 2477 n. 4 (quoting 21 U.S.C. § 352(j)). Plaintiff has not raised the federal branding statute as an issue and has generally claimed that a more robust warning would have ameliorated the risks of Invokana. The Court therefore assumes that the possible branding statute exception does not apply to this case.

New Hampshire that the Supreme Court analyzed in Bartlett. See Bartlett, 133 S.Ct. at 2475–76 ("To determine whether a product is 'unreasonably dangerous,' the New Hampshire Supreme Court employs a 'risk-utility approach' under which 'a product is defective as designed if the magnitude of the danger outweighs the utility of the product.' . . . While the set of factors to be considered is ultimately an open one, the New Hampshire Supreme Court has repeatedly identified three factors as germane to the risk-utility inquiry: 'the usefulness and desirability of the product to the public as a whole, whether the risk of danger could have been reduced without significantly affecting either the product's effectiveness or manufacturing cost, and the presence and efficacy of a warning to avoid an unreasonable risk of harm from hidden dangers or from foreseeable uses.' " (quoting Vautour, 147 N.H. at 153–54, 784 A.2d at 1181–82)). A design defect claim under Georgia law therefore allows a drug manufacturer to ameliorate the risks of danger of the drug and thus to fulfill its legal duty by improving the warnings attached to the product.

In Bartlett, the Supreme Court decided that the drug manufacturer could neither redesign its product nor alter its warning labels without FDA approval, and it was thus impossible for the manufacturer to comply with both state and federal law. This case, however, involves a brand name drug manufacturer. As the Court explained in Levine and Mensing, a brand name drug manufacturer may use the FDA's CBE regulation to unilaterally change its labeling without prior FDA approval. In doing so, a brand name drug manufacturer may comply with both state and federal law. See Sullivan v. Aventis, Inc., No. 14–CV–2939–NSR, 2015 WL 4879112, at *6 (S.D.N.Y. Aug. 13, 2015) ("Furthermore, even if redesign is not feasible, there is no federal law that prevents a manufacturer from complying with its state-law duty by strengthening a brand-name drug's warning label. . .And the Supreme Court in Levine made it abundantly clear that a state-law duty to strengthen a drug's warning label in no way conflicts with federal statutory and regulatory labeling requirements for brand-name drugs."). State law claims, including a design defect claim, requiring a brand name drug manufacturer to provide a more robust warning are therefore not preempted.

How far to extend Bartlett is a difficult legal issue and one that has divided the courts that have confronted the issue. See In re Vioxx Products Liab. Litig., No. MDL 1657, 2015 WL 1909859, at *10 (E.D.La. Apr. 21, 2015) ("Looking to the preemption argument, the Court notes that the scope of the Bartlett holding has been the subject of much debate among lower courts. Some courts read Bartlett narrowly to apply only to generic drugs. Others disagree, finding that Bartlett preempts design-defect claims against brand-name manufacturers as well." (citations omitted)). None of the cases cited by the Parties or discovered by the Court are binding precedent that requires the Court to come to a different conclusion than the one it has reached here.

Defendants rely on a case decided by the United States Court of Appeals for the Sixth Circuit, Yates v. Ortho–McNeil–Janssen Pharm., Inc., 808 F.3d 281 (6th Cir.2015), that found the Plaintiff's design defect claims were preempted by federal law. The Sixth Circuit noted that "the Bartlett Court did not reach the sweeping conclusion that all design defect claims are preempted by federal law." Yates, 808 F.3d at 296. The Sixth Circuit also stated that "[b]ecause the federal statutes and regulations for brand-name and generic drugs are sometimes different, however,

brand-name and generic drugs may face different impossibility preemption results in some circumstances." Id. at 297. In Yates, the underlying state law involved similar risk-utility analysis that allowed brand name drug manufacturers to "avoid liability by strengthening a drug's warning label." Id. at 298. Nevertheless, the Sixth Circuit found that the FDA's regulations, prohibiting a manufacturer from making any major changes to the formulation of drug already on the market, whether generic or brand name, preempted the plaintiff's claim that the manufacturer should have reduced the amount of one ingredient in the drug. Id. at 298–99. It remains unclear from the Sixth Circuit's reasoning why the design defect claim could not have survived in light of the risk-utility factor of strengthening a warning label, which may not be preempted.[7] The Sixth Circuit reached this decision despite its own interpretation of Bartlett that limited Bartlett as holding "that the plaintiff's state law design defect claim regarding the generic drug was barred by impossibility preemption because the sameness requirement prohibited the manufacturer from unilaterally changing the composition or labeling of the drug, as state law required." Id. at 296.

 The Court does not find that the Sixth Circuit's conclusion in Yates is persuasive as it does not demonstrate the impossibility standard for preemption was met. In this Court's opinion, Bartlett and Levine would allow a state law design defect claim to survive preemption if there was any way for the manufacturer to comply with both federal and state law. If the Court were to follow Yates, it is unclear what design defect claims against drug

manufacturers would not be preempted. See also Trahan v. Sandoz, Inc., No. 3:13–CV–350–J–34MCR, 2015 WL 2365502, at *9 n. 5 (M.D.Fla. Mar. 26, 2015) ("[T]his Court does not interpret the Bartlett decision to change course and foreclose all design defect claims against prescription drug manufacturers in the absence of an express statement that it was doing so."). The conclusion reached by Defendants, and the Sixth Circuit in Yates, ignores that Bartlett relied on the FDA regulations prohibiting changes to labeling for generic drug manufacturers. Guenther v. Novartis Pharm. Corp., No. 6:08–CV–456–ORL–31, 2013 WL 4648449, at *5 (M.D.Fla. Aug. 29, 2013) ("However, a review of the opinion [in Bartlett] demonstrates that the FDCA's prohibition on label alterations by generic drug manufacturers was as central to the decision in that case as it was in [Mensing]."); see also In re Tylenol (Acetaminophen) Mktg., No. 2436, 2015 WL 7075949, at *21–22 (E.D.Pa. Nov. 13, 2015) ("As explained in [Mensing], the same federal regulations that apply to generic manufacturers do not necessarily apply to brand-name manufacturers, such as the defendants....I find that Bartlett—a case involving a generic manufacturer and following PLIVA v. Mensing—does not apply to the Plaintiff's design defect claim against a brand-name manufacturer. Under the dictates of Wyeth v. Levine, preemption is not warranted.").

There are other compelling reasons to read Bartlett more narrowly. As another district court has explained:

> There are equally compelling policy justifications for reading Bartlett and Mensing narrowly so as to preserve the viability of products liability actions. As

---

7. Perhaps the plaintiff did not make any allegations that a stronger warning would have made the degree of potential danger more reasonable. It is unclear. It should be noted,

however, that the Sixth Circuit did affirm the dismissal of the plaintiff's failure to warn claim on summary judgment on the merits. Yates, 808 F.3d at 292.

the Court recognized in Wyeth, state-law tort suits play an important complementary role to federal drug regulation. The FDA has limited resources, which constrain its ability to police the drug market and protect the public. State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons to come forward with information. Moreover, because the FDCA does not create a private right of action, products liability suits provide injured consumers like Plaintiff with an important remedy not available under federal law.

Hunt v. McNeil Consumer Healthcare, 6 F.Supp.3d 694, 704 (E.D.La.2014) (citations, footnote, and internal quotation marks omitted).

Based on the foregoing reasoning, the Court concludes that Plaintiff's design defect claims are not preempted.

### III. Conclusion

ACCORDINGLY, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss [10]. The Court **GRANTS** Defendants' Motion to Dismiss and **DISMISSES** Plaintiff's claims against Defendant Johnson & Johnson **WITHOUT PREJUDICE**. The Court **GRANTS** Defendants' Motion to Dismiss and **ORDERS** Plaintiff to file an Amended Complaint **WITHIN TWENTY-ONE (21) DAYS OF DATE OF THIS ORDER** that provides a more definite statement of Plaintiff's claims, as specifically directed in Part II.B of this Order. The Court **DIRECTS** the Clerk to **RE-SUBMIT** this case to the Court after the conclusion of the twenty-one day period if Plaintiff fails to comply with this Order.

The Court otherwise **DENIES** Defendants' Motion to Dismiss.

IT IS SO ORDERED, this the 24 day of March, 2016.